STATE OF NORTH CAROLINA v. GARY FERNANDEZ

No. 198A95

(Filed 9 May 1997)

**1. Evidence and Witnesses § 1255 (NCI4th)— custodial interrogation—invocation of right to counsel—further interrogation—initiation of conversation by defendant**

Once an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing merely that he responded willingly to further police-initiated custodial interrogation, even if he had been again advised of his rights. In such case, the accused may not be further interrogated until counsel has been made available to him unless the accused himself initiates further communication with the police.

**Am Jur 2d, Criminal Law §§ 788-797.**

**What constitutes "custodial interrogation" within rule of *Miranda v. Arizona* requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

**What constitutes assertion of right to counsel follow *Miranda* warnings—state cases. 83 ALR4th 443.**

1

STATE v. FERNANDEZ

[346 N.C. 1 (1997)]

2. **Evidence and Witnesses § 1250 (NCI4th)— custodial interrogation—right to counsel not invoked—voluntariness of statement**

Defendant did not invoke his right to an attorney during custodial interrogation, and his inculpatory statement indicating the location of a shotgun used in two murders was the product of a voluntary, intelligent, and knowing waiver of defendant's *Miranda* rights, where the evidence at a pretrial hearing to determine the admissibility of defendant's custodial statements showed that defendant signed a note asking to speak with the sheriff; when brought to the sheriff's office, defendant asked for an officer who spoke Spanish to act as a translator although defendant spoke English; defendant stated that he did not need a lawyer; when the translator arrived, he advised the sheriff that defendant had an attorney; defendant wrote a note that he wanted to talk with officers without his attorney present; defendant was advised of his rights in Spanish, including his right to have counsel present, and he stated that he understood his rights; defendant read and signed the waiver of rights form; and defendant then gave his statement during which the location of the shotgun was revealed.

**Am Jur 2d, Criminal Law §§ 788-797.**

**What constitutes "custodial interrogation" within rule of *Miranda v. Arizona* requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

**What constitutes assertion of right to counsel follow *Miranda* warnings—state cases. 83 ALR4th 443.**

3. **Searches and Seizures § 100 (NCI4th)— search warrant— false information in affidavit—failure to show bad faith**

Defendant failed to show that a search warrant was invalid and that evidence seized thereunder was inadmissible under *Franks v. Delaware*, 438 U.S. 154 (1978) and N.C.G.S. § 15A-978 on the ground facts necessary to establish probable cause were asserted in the affidavit either with knowledge of their falsity or with a reckless disregard for the truth where the affiant, an SBI agent, testified at the hearing on defendant's motion to suppress that the vast majority of information set forth in the affidavit was gleaned from discussions with other law officers who had talked

STATE v. FERNANDEZ

[346 N.C. 1 (1997)]

directly with witnesses, and other evidence presented by defendant at the hearing only served to contradict assertions contained in the affidavit but failed to show bad faith by the affiant.

**Am Jur 2d, Searches and Seizures §§ 119, 120.**

**Propriety of considering hearsay or other incompetent evidence in establishing probable cause for issuance of search warrant. 10 ALR3d 359.**

4. **Evidence and Witnesses § 657 (NCI4th)— search warrant—motion to suppress—knowing falsehoods in affidavit—deposition inadmissible**

In a hearing on a motion to suppress evidence seized pursuant to a search warrant on the ground that the affidavit contained known falsehoods, the trial court properly refused to admit the deposition of a witness to illustrate contradictions between the affidavit and his deposition testimony where defendant conceded that the deposition did not state that the witness did not make the statements attributed to him in the affidavit, and the deposition did not tend to establish knowing falsehoods or reckless disregard for the truth by the affiant. Even if the trial court erred by excluding the deposition, such error was harmless where the affidavit was sufficient to establish probable cause for issuance of the search warrant even if the portions of the affidavit that defendant claims are inconsistent with the deposition are stricken.

**Am Jur 2d, Searches and Seizures §§ 119, 120.**

**Propriety of considering hearsay or other incompetent evidence in establishing probable cause for issuance of search warrant. 10 ALR3d 359.**

5. **Searches and Seizures § 19 (NCI4th)— standing to contest search—withdrawal of motion to suppress—ruling deemed correct**

The trial court's determination that defendant did not have standing to contest the search of a storage building used by his natural and "adopted" families will be deemed correct where defendant, after attempting briefly to establish standing, withdrew his motion to suppress the evidence seized during the search and ultimately decided not to contest the search.

**Am Jur 2d, Evidence § 646.**

6. **Criminal Law § 120 (NCI4th Rev.)— discovery—failure to produce written statement—statement lost—refusal to strike testimony**

The trial court did not err by refusing to strike the testimony of a witness in a kidnapping and murder trial as a sanction for the State's failure to produce the written statement of the witness pursuant to a court order where the record shows that the State diligently attempted to locate the written statement but that it was lost, and the State thus did not "elect" not to comply with the court's order in violation of N.C.G.S. § 15A-903(f)(4). Moreover, defendant was not prejudiced by the loss of the statement where the witness's testimony related only to her discovery of the crime scene upon arriving at work and seeing the male victim's car heading in a direction away from the scene; notes taken by an officer on the morning of the crimes show that the witness made statements consistent with the trial testimony; and defendant could not have shown that the witness made a prior inconsistent statement.

**Am Jur 2d, Depositions and Discovery §§ 426, 427.**

**Sanctions against defense in criminal case for failure to comply with discovery requirements. 9 ALR4th 837.**

7. **Appeal and Error § 150 (NCI4th)— double jeopardy—failure to preserve issue for appeal**

Defendant failed to preserve for appellate review the issue as to whether he was placed in double jeopardy when he was convicted and sentenced for two murders and his convictions for kidnapping the same victims were elevated to first-degree based on his failure to release the victims in a safe place because they were murdered where defendant failed to object at trial to the submission of first-degree kidnapping on the ground of double jeopardy.

**Am Jur 2d, Appellate Review § 614.**

8. **Constitutional Law § 202 (NCI4th)— conviction of murder—elevation of kidnapping based on murder—not double jeopardy**

Defendant did not receive multiple punishments for the same offense in violation of the prohibition against double jeopardy when he was convicted and sentenced for two murders and his convictions for kidnapping the same victims were elevated to first-degree based on his failure to release the victims in a safe

place because they were murdered since each crime required proof of an element not required to be proved in the other crime.

**Am Jur 2d, Criminal Law § 266.**

9. **Criminal Law § 878 (NCI4th Rev.)— jury's failure to return complete verdict—further deliberation—inability to agree—instructions on duties of jurors**

In a murder prosecution wherein the jury returned a verdict finding defendant guilty of first-degree murder based upon the felony murder rule but left blank its finding as to first-degree murder based upon premeditation and deliberation, the trial court sent the jury back to the jury room to continue deliberation on the charge of first-degree murder based upon premeditation and deliberation, and the jury advised the court shortly thereafter that it had not reached unanimity based on this charge, the trial court did not then coerce a verdict in favor of the prosecution by its instructions on the duties of the jurors during deliberations, although the court did not give all of the instructions listed in N.C.G.S. § 15A-1235(b) verbatim, where the instructions contained the substance of the statutory instructions in that they fairly apprised the jurors of their duty to reach consensus after open-minded debate and examination without sacrificing their individually held convictions merely for the sake of returning a verdict.

**Am Jur 2d, Trial §§ 1580, 1588, 1593-1595.**

10. **Criminal Law § 878 (NCI4th Rev.)— deadlocked jury—substance of statutory instructions**

When the trial court perceives the jury may be deadlocked or may be having some difficulty reaching unanimity, and the trial court in its discretion gives further instruction, no clear violation of N.C.G.S. § 15A-1235(b) will be found to exist as long as the trial court gives the substance of the four instructions found in that statute. Any contrary inference from *State v. Williams*, 315 N.C. 310 (1986), is disavowed.

**Am Jur 2d, Trial §§ 1580, 1588, 1593-1595.**

11. **Criminal Law § 467 (NCI4th Rev.)— prosecutor's closing argument—statements supported by evidence or inferences from evidence—no denial of fair trial**

Statements in the prosecutor's closing argument in a kidnapping and murder trial that defendant had sex with the female vic-

tim the night she was kidnapped, that the male victim witnessed the assault and suffered lacerations to his face as he reacted to it, that the victims suffered extreme indignities as explained in a book, and that the victims would not be bearing any children for their parents were supported by the evidence or were reasonable inferences drawn from the evidence and did not deprive defendant of a fair trial.

### Am Jur 2d, Trial §§ 632-639.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two consecutive sentences of life imprisonment entered by Strickland, J., at the 17 October 1994 Criminal Session of Superior Court, Onslow County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional convictions was allowed 19 August 1996. Heard in the Supreme Court 11 December 1996.

*Michael F. Easley, Attorney General, by Jill Ledford Cheek, Assistant Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

LAKE, Justice.

On 7 January 1992, defendant was indicted for two counts of first-degree murder and two counts of first-degree kidnapping. On 19 July 1994, an additional indictment was issued for second-degree burglary, felonious larceny, and felonious possession of stolen goods. Also on 19 July 1994, defendant was indicted for felonious breaking and entering, felonious larceny, felonious possession of stolen goods and safecracking. Defendant was tried capitally to a jury at the 17 October 1994 Criminal Session of Superior Court, Onslow County, Judge James R. Strickland presiding. On 15 November 1994, the State changed the charge of first-degree burglary to breaking and entering and dismissed all possession of stolen goods charges.

The jury found defendant guilty of both murders on the basis of malice, premeditation, and deliberation and under the felony murder rule; it additionally found defendant guilty of two counts of felonious breaking and entering, two counts of felonious larceny, two counts of first-degree kidnapping and one count of safecracking. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the

STATE v. FERNANDEZ

[346 N.C. 1 (1997)]

jury was unable to reach a unanimous decision as to sentencing in either murder case. Accordingly, Judge Strickland sentenced defendant to a mandatory life sentence for each of the first-degree murder convictions. Judge Strickland also sentenced defendant to consecutive terms of imprisonment totaling 130 years for the remaining convictions. For the reasons stated herein, we conclude that the defendant received a fair trial, free of prejudicial error.

The State's evidence tended to show that in July of 1990, the two victims, Scott Gasperson and Phyllis Aragona, were living together and were engaged to be married. Gasperson was the manager of Woodson Music and Pawn Store, located in the Piney Green Shopping Center, in Jacksonville, North Carolina, one of seven Woodson stores owned by Gasperson, Inc. Aragona managed one of the other Woodson stores.

On the morning of 12 July 1990, Kimberly Paulson was scheduled to work at the Piney Green store and was to open the store with Gasperson at 9:00 a.m. She was running late, however, and on her way to the store she saw Gasperson's car, a red Chevrolet Baretta, with two people inside heading in a direction away from the store about a mile from the Piney Green location. She arrived at the store at approximately 9:10 a.m. and knocked on the locked front door. There was no answer. The metal gate to the front door was open, and upon looking inside through the glass door, Paulson saw a jewelry box on the floor and a light on in the back of the store. She left the store and went to the home of Donald Whalen, the assistant manager of the Piney Green store, to tell him what she had observed.

Whalen went to the store and found it had been ransacked. Upon entering the store, he noticed that the alarm had been deactivated, that the safe was open, and that items were spread all over the store. An accounting of merchandise revealed that approximately $69,606.39 in cash and jewelry were missing from the store. As well as the scattered inventory, Whalen noticed pieces of duct tape on the floor. Whalen called the police, who conducted an analysis of the scene. In addition to the above-described scene, the police also found a bloodstained pillowcase in the store.

Shortly thereafter, a Sheriff's Department employee went to the residence of Gasperson and Aragona in an attempt to locate them. The back door of the residence was ajar. After knocking and calling for Gasperson and Aragona and after receiving no reply, a room-to-room search was conducted of the residence. A plastic wrapper from

a package of duct tape was found in the toilet, and a piece of duct tape was located on the bed in the master bedroom. Further examination revealed that the front door and lock had been damaged from being pried open. Also, numerous personal items were missing from the residence, including Aragona's jewelry and Gasperson's shotgun, camcorder and comic book collection.

A search for Gasperson's car on 12 July 1990 revealed the car and Gasperson's body in a wooded area approximately seven to nine miles from the store. His body was found lying in a fetal position on the ground between the open car door and the car body, with a large wound to the left side of his head. There was duct tape in his hair, and a homemade "hood" was over his head. There were two types of duct tape wrapped around Gasperson's head, one with cloth-backing reinforcement, the other a cheaper brand without the reinforcement. An autopsy revealed that Gasperson had been killed by a shotgun blast to the head at point-blank range.

Aragona's body was not located until almost nine months later. On 7 April 1991, the skeletal remains of Phyllis Aragona were recovered from a wooded area near the intersection of Highways 421 and 53 in Pender County and identified by dental records. Authorities noted the presence of scattered skeletal remains, pieces of duct tape connected to hair, a .380 automatic shell casing and numerous items of clothing nearby. An autopsy revealed that Aragona died from a single gunshot wound to the head. The pathologist who performed the autopsy found metallic bullet fragments in the skull and turned them over to authorities for analysis.

Jeannette Ocasio, the daughter of Maria Monserrate, defendant's girlfriend, testified at trial. She stated that the defendant, the defendant's son Orlando, and Maria Monserrate were living in a trailer at Lot 41, Pelletier Mobile Home Park with other family members in July 1990. On the afternoon of 12 July 1990, defendant, Monserrate and Orlando picked up Ocasio from work in their blue Ford Thunderbird. On the way home, they stopped at a gas station, where defendant and Monserrate both gave Ocasio several hundred dollars in cash from a "wad of money" they were carrying. Monserrate told Ocasio that the three of them were leaving for Florida because they had committed a robbery and they thought someone had seen them. From the gas station, they went to a storage unit, where clothes, a bag full of gold jewelry and a gun were removed. Ocasio was dropped off at a local motel, and the three others left. Ocasio received a phone call from

Monserrate on 18 July 1990 inquiring about the situation back in North Carolina. Later that day, the authorities questioned Ocasio, and Ocasio told them everything she had seen and heard.

Pursuant to a search warrant, authorities conducted a search on 18 July 1990 of the trailer at Lot 41, Pelletier Mobile Home Park in Jacksonville, the residence of the defendant and Maria Monserrate. Captain Keith Bryan of the Onslow County Sheriff's Department testified that upon entering the trailer, he saw a poster with a piece of duct tape wrapped around it, and he found another piece of duct tape under the couch. Proceeding down the hallway, Bryan saw a pillowcase with a floral pattern that "matched completely" the curtains and sheets in Gasperson's and Aragona's bedroom. Located on a chest in the bedroom was a duct tape label identical in manufacturer and price tag to the label recovered from the toilet of the victims' residence. Inside the chest of drawers, Bryan seized two .380 automatic pistol bullets and one shotgun shell. Also in the dresser was a partial roll of the cheaper duct tape identical to the cheaper duct tape found on Gasperson's head and on the victims' bed. Bryan also found three homemade "hoods" similar to the hood on Gasperson's head, as well as a pillow on which a stain matched the pattern, color and location of the stain found on the pillowcase in Woodson Music and Pawn. Bryan saw a screwdriver on a shelf in the closet; the unusual shape of the end matched the markings he had observed on the door of the victims' residence. Bloodstained towels were found in a basket of dirty clothes. The blood was later identified as type AB, the most rare blood type, and the same blood type as Gasperson, but different from all of the trailer's residents. Bryan found several more pieces of the same duct tape and a partially burned business card from Woodson Music and Pawn in a garbage bag outside the trailer.

The same day, 18 July 1990, Bryan conducted a search pursuant to a warrant of unit C-23 at Autry's Mini Storage south of Jacksonville. Bryan recovered a tennis-type bag that was similar to one known to be missing from one of the victims' cars. Inside the bag was a claim ticket for film with Gasperson's name on it. Other items in the bin matched descriptions of items known to be missing from the victims' cars and residence.

The evidence established that the defendant, Monserrate and Orlando drove to Miami and then fled by boat to the Dominican Republic. Defendant's blue Ford Thunderbird was recovered in Florida. Defendant and Monserrate were arrested in December 1991.

While in jail, defendant gave a statement to Onslow County authorities about the crimes and helped them locate a Mossburg shotgun used in the crimes. Also while in jail, defendant talked to a fellow inmate, Arthur Bollinger, and disclosed that he had been involved in the killings. Specifically, he told Bollinger that he had shot "the girl" and that his son Orlando had shot "the boy." He also told Bollinger that the girl had been "beaten up" and sexually assaulted, and that he and his son had sex with her several times before she was shot. Defendant told Bollinger that he had taken officers to the location of the shotgun used to shoot Gasperson as well.

Defendant presented no evidence.

In his first assignment of error, defendant argues that the trial court erred by denying his motion to suppress his statement made to law enforcement authorities, and the shotgun subsequently recovered, because defendant was denied his right to counsel, right to silence, and right to due process as guaranteed by the state and federal constitutions. This is based on defendant's assertion that he did not initiate the conversation on 26 June 1992 to discuss his case, but only to talk about plea bargain arrangements for family members. Defendant claims that he indicated in his note to the sheriff that he would not talk about the case until the following Monday in the presence of his attorney, and that the officers' refusal to honor this request resulted in the improper statements and evidence. We conclude that the findings of fact, which are supported by evidence in the record, and in turn sustain the conclusions of law, do not support defendant's argument.

[1] " 'The ultimate test of the admissibility of a confession is whether the statement was in fact voluntarily and understandingly made.' " *State v. Braxton*, 344 N.C. 702, 708, 477 S.E.2d 172, 175 (1996) (quoting *State v. Davis*, 305 N.C. 400, 419, 290 S.E.2d 574, 586 (1982)). In order to ensure voluntariness and understanding, an accused is entitled, under the Fifth and Fourteenth Amendments, to have counsel present during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). *Miranda* enunciates a "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.*, 442 U.S. 707, 719, 61 L. Ed. 2d 197, 209 (1979). Once the accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing merely that he responded willingly to further

police-initiated custodial interrogation, even if he has been again advised of his rights. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386 (1981). In such case, the accused may not be further interrogated by law enforcement officials until counsel has been made available to him unless the accused himself initiates further communication with the police. *Id.* However, the question of who initiated communication between a defendant and the authorities becomes relevant *only after* a defendant has requested counsel. *Id.*

On defendant's motion *in limine*, a pretrial hearing was conducted before Judge Strickland on 17 August 1994 to determine the admissibility of defendant's custodial statements. Evidence was presented by the State and the defendant. Defendant himself testified at the hearing. At the close of the evidence, Judge Strickland made findings of fact and conclusions of law that defendant's statements were made freely, understandingly and voluntarily; that he freely, knowingly, intelligently and voluntarily waived his rights under *Miranda*; that he agreed to speak with the officers without the presence of an attorney; and that there was no violation of defendant's right to counsel or other constitutional rights.

If supported by competent evidence, the trial court's findings of fact are conclusive on appeal. "If there is a conflict between the [S]tate's evidence and defendant's evidence on material facts, it is the duty of the trial court to resolve the conflict and such resolution will not be disturbed on appeal." *State v. Chamberlain*, 307 N.C. 130, 143, 297 S.E.2d 540, 548 (1982). The trial court's findings of fact must be supported by the evidence, and the conclusions of law must be supported by the findings of fact. *State v. Payne*, 327 N.C. 194, 208-09, 394 S.E.2d 158, 166 (1990), *cert. denied*, 498 U.S. 1092, 112 L. Ed. 2d 1062 (1991). Further, the trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found. *Id.* at 209, 394 S.E.2d at 166.

**[2]** The evidence in the record from the motion hearing supports Judge Strickland's findings of fact and conclusions of law that the defendant was not improperly interrogated and that he did not invoke his right to counsel. Just before 5:00 p.m. on Friday, 26 June 1992, defendant sent word, by a jailer, that he wanted to talk with Sheriff Brown. Brown, however, required a note from defendant before he would talk with him. Accordingly, defendant sent a note stating that he "need[ed] to speak with [Brown]," that it was "impor-

tant." Brown would still not talk with defendant until he signed the note, which defendant did. Brown immediately notified Major Freeman, who was working on the case, that defendant had asked to speak with Brown. Defendant was then brought to Sheriff Brown's office, and a discussion took place wherein defendant requested that their conversation be recorded. At the beginning of the conversation, defendant asked for Jacksonville Police Detective Candido Suarez, who spoke Spanish, to act as a translator. Even though defendant spoke English, he wished to converse more fluently. Before Suarez arrived, defendant was tape recorded as saying the following:

> Okay, now I'll tell the Sheriff Brown and the Major Freeman my name is Gary Fernandez. I feel now that I need to talk with the and major, the Major Freeman, District Attorney. District Attorney, Bill Andrews in person to person in reference my case and I telling now I don't need a lawyer for myself. I, I give me my authorization but I do not need a lawyer. You know. But I need to talk soon as possible for Bill Andrews and in front of the Sheriff Brown and Major Freeman as is possible one interpreter in English and Spanish.

Sheriff Brown contacted Prosecutor Andrews, who advised Brown that the code of ethics would not permit him to talk with defendant. When the tape concluded, the recorder was turned off, and all present waited for Suarez, the interpreter, to arrive. There was no further conversation until Suarez arrived.

The evidence then shows that, when Detective Suarez arrived around 6:00 p.m., Suarez advised Sheriff Brown and Major Freeman that defendant had an attorney. Sheriff Brown told the defendant, through the interpreter, that if defendant wanted to talk with them without his attorney present, he needed to write a note to that effect. Defendant did so. Thereupon, defendant was advised of his rights in Spanish, including his right to have counsel present, and he stated in response that he understood his rights. Defendant was familiar with these rights, having been advised of them approximately four times in the past. Defendant then read the waiver of his rights and signed it. Only then did defendant give his statement from which the location of the shotgun was revealed. As shown by the evidence, it is clear that defendant did not invoke his right to an attorney, and that the statement and resulting evidence were the product of a voluntary, intelligent and knowing waiver of defendant's *Miranda* rights. Thus, this assignment of error is overruled.

**[3]** In his second assignment of error, defendant contends that the search warrant issued for the search of the mobile home located at Lot 41, Pelletier Mobile Home Park was fatally flawed because it was based on an affidavit containing known falsehoods or made with a reckless disregard for the truth. Specifically, the defendant argues that several of the statements in the affidavit attributed to Timothy Snyder, the mobile home park maintenance man, were not made by Snyder, and that the deposition of another witness upon whom the affidavit was based, Miguel Angel Guzman, should have been admitted because it would have shown that statements attributed to Guzman also were not made. Defendant contends that because the search warrant was improperly obtained, the evidence seized from the mobile home should have been suppressed. We disagree.

The requirement that a search warrant be based on probable cause is grounded in both constitutional and statutory authority. U.S. Const. amend. IV; N.C.G.S. § 15A-244 (1988). Probable cause for a search is present where facts are stated which establish reasonable grounds to believe a search of the premises will reveal the items sought and that the items will aid in the apprehension or conviction of the offender. *State v. Arrington*, 311 N.C. 633, 636, 319 S.E.2d 254, 256 (1984). It is elementary that the Fourth Amendment's requirement of a factual showing sufficient to constitute "probable cause" anticipates a truthful showing of facts. *Franks v. Delaware*, 438 U.S. 154, 164-65, 57 L. Ed. 2d 667, 678 (1978). "Truthful," as intended here, "does not mean . . . that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165, 57 L. Ed. 2d at 678. Rather, "truthful" in this context means "that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* "[R]esolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109, 13 L. Ed. 2d 684, 689 (1965). *Franks* held that where a search warrant is issued on the basis of an affidavit containing false facts which are necessary to a finding of probable cause, the warrant is rendered void, and evidence obtained thereby is inadmissible if the defendant proves, by a preponderance of the evidence, that the facts were asserted either with knowledge of their falsity or with a reckless disregard for their truth. *Franks*, 438 U.S. at 155-56, 57 L. Ed. 2d at 672; *State v. Louchheim*, 296 N.C. 314, 320-21, 250 S.E.2d 630, 635, *cert. denied*, 444 U.S. 836, 62 L. Ed. 2d 47 (1979).

There is a presumption of validity with respect to the affidavit supporting the search warrant. *Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682. Before a defendant is entitled to a hearing on the issue of the veracity of the facts contained in the affidavit, he must make a preliminary showing that the affiant knowingly, or with reckless disregard for the truth, made a false statement in the affidavit. *Id.* at 155-56, 57 L. Ed. 2d at 672. Upon any evidentiary hearing, the only person whose veracity is at issue is the affiant himself. *Id.* at 171, 57 L. Ed. 2d at 682. A claim under *Franks* is not established merely by evidence that contradicts assertions contained in the affidavit, or even that shows the affidavit contains false statements. Rather, the evidence must establish facts from which the finder of fact might conclude that the affiant alleged the facts in bad faith. *State v. Winfrey*, 40 N.C. App. 266, 269, 252 S.E.2d 248, 249, *disc. rev. denied*, 297 N.C. 304, 254 S.E.2d 922 (1979). N.C.G.S. § 15A-978 codifies the rule enunciated in *Franks* and sets forth the following:

(a) A defendant may contest the validity of a search warrant and the admissibility of evidence obtained thereunder *by contesting the truthfulness of the testimony showing probable cause for its issuance.* The defendant may contest the truthfulness of the testimony by cross-examination or by offering evidence. For the purposes of this section, truthful testimony is testimony which reports in *good faith* the circumstances relied on to establish probable cause.

N.C.G.S. § 15A-978(a) (1988) (emphasis added).

In this case, the defendant moved to suppress evidence seized from his residence on the ground that the information used to obtain the search warrant was based on an unreliable, incompetent source. The trial court determined that defendant's initial showing was sufficient to require a hearing under the authority of *Franks*. At the motion hearing, the affiant, Special Agent Tony Cummings of the North Carolina State Bureau of Investigation, testified to the information upon which his affidavit in support of the search warrant was based. The vast majority of the information was gleaned from discussions with other law enforcement officers who had talked directly with witnesses. Information attributed to Snyder was relayed by Major Doug Freeman of the Onslow County Sheriff's Department. Most of the information from Guzman was related by Detective Mack Whitney, also of the Onslow County Sheriff's Department. The affidavit noted the secondhand sources of the information, and

STATE v. FERNANDEZ

[346 N.C. 1 (1997)]

Cummings affirmed the attributions during the motion hearing. Snyder also testified at the hearing. Portions of his testimony matched the information in the affidavit, portions contradicted the affidavit and portions revealed Snyder's inability to remember exactly what happened. Next, defendant attempted to introduce the deposition of Guzman that had been taken two years after the affidavit (and two years prior to the trial) due to Guzman's failing health related to AIDS. The State objected, arguing that the deposition did not properly address the *Franks* issue of the affiant's belief in the truthfulness of the information contained in the affidavit. After extensive argument by all parties, the trial court sustained the State's objection and refused to admit Guzman's deposition. The trial court went on to hold that the search warrant had been properly granted.

After a careful review of the record, we hold that the trial court was correct in its determination that a sufficient showing was not made under *Franks* to warrant excluding the evidence seized from Lot 41, Pelletier Mobile Home Park. Evidence presented by defendant at the motion hearing only served to contradict assertions contained in the affidavit. Defendant presented no evidence that the affiant had alleged such facts in bad faith such that they were knowingly false or in reckless disregard of the truth. Thus, defendant failed to meet his burden of proof under *Franks*.

[4] We further hold that the trial court acted properly in not admitting the deposition of Guzman. Defendant sought to introduce Guzman's deposition to illustrate contradictions between the information in the affidavit and Guzman's subsequent testimony through deposition. However, when asked directly by the trial court, defendant conceded that nowhere in his deposition did Guzman testify that he did not say the things that were attributed to him in the affidavit. Since the only value of the deposition testimony was to establish contradictions in the facts underlying the affidavit, and not to establish knowing falsehoods or reckless disregard of the truth on the part of the affiant, it was not relevant to the establishment of a *Franks* claim and was properly excluded. Defendant submits that under such an application, defendants will never be able to establish a *Franks* violation. This is not the case. If a defendant puts forth evidence establishing that a witness never said what was attributed to him or her in the affidavit, then the finder of fact is free to find such testimony persuasive and thereby exclude a search pursuant to *Franks*. The simple fact is that defendant failed to do so in this case.

Assuming *arguendo* that the trial court erred by excluding Guzman's deposition, such error was harmless. In the deposition, Guzman testified that he overheard defendant and his son Orlando discuss abducting Gasperson and Aragona and robbing the pawn shop on at least two occasions prior to the actual crimes. He stated that defendant and Orlando tried to get him to take part in the robbery. Guzman further revealed that defendant told him about a month before the robbery that he would be leaving town and that Guzman could have all of the furniture in his trailer for one hundred dollars. Guzman also testified that he was able to connect defendant to the murders because he heard defendant talking about the plan previously. He stated that defendant came to his house on the day after the robbery, and that he gave defendant's name to the authorities because defendant's appearance at Guzman's house that day made Guzman fearful for his life. Based on this evidence, the affidavit is sufficient to establish probable cause even if the portions of the affidavit that defendant claims are inconsistent with the deposition are stricken. *Louchheim*, 296 N.C. at 320-21, 250 S.E.2d at 636. Thus, any error alleged as a result of not admitting Guzman's deposition was harmless.

[5] Defendant next assigns error to the trial court's ruling that defendant did not have standing to contest the search of the storage unit used by both his natural and "adopted" family. Defendant contends that he had an expectation of privacy in the storage unit because of the closeness of the family situation and the location of many of his personal items in the unit. Thus, defendant maintains the trial court should have granted him standing to challenge the evidence seized. We determine that defendant's contentions are without merit.

"An individual's standing to claim the protection of the Fourth Amendment depends upon whether the place invaded was an area in which such individual 'had a reasonable expectation of freedom from governmental intrusion.' " *State v. Alford*, 298 N.C. 465, 471, 259 S.E.2d 242, 246 (1979) (quoting *Mancusi v. DeForte*, 392 U.S. 364, 368, 20 L. Ed. 2d 1154, 1159 (1968)). "Absent ownership or possessory interest in the premises or property, a person has no standing to contest the validity of a search." *State v. Greenwood*, 301 N.C. 705, 707-08, 273 S.E.2d 438, 440 (1981). In this case, defendant made a motion to suppress the evidence seized during a search of the storage unit. The trial court first addressed whether defendant had standing to contest the search. After attempting briefly to establish standing,

defendant withdrew his motion and ultimately decided not to contest the search of the storage unit. As a result, the trial court's determination that defendant did not have standing was correct in light of defendant's concession on this issue. Defendant's assignment of error is overruled.

**[6]** In his next assignment of error, defendant asserts that the trial court erred by denying defendant's motions for sanctions after the State failed to produce the written statement of witness Kimberly Paulson. Defendant argues that the trial court should have stricken the testimony of witness Paulson because defense counsel was unable to cross-examine her regarding her written statement, depriving defendant of his rights to confrontation and due process. We find defendant's argument unpersuasive.

N.C.G.S. § 15A-903(f)(4) governs the sanctioning of the State regarding compliance with orders to produce evidence. The statute provides in pertinent part that if the State "*elects* not to comply" with the order, "the court shall strike from the record the testimony of the witness . . . unless the court determines that the interests of justice require that a mistrial be declared." N.C.G.S. § 15A-903(f)(4) (1988) (emphasis added). The "elects" language in the statute indicates that this section only applies to willful failures to produce evidence.

In this case, the record does not establish that the State willfully "elected" not to comply with the order in violation of N.C.G.S. § 15A-903(f). In fact, the record shows the State diligently and repeatedly attempted to locate witness Paulson's written statement in its files. The statement, however, was simply lost. Defendant acknowledged this during *voir dire* when he agreed that the State was not "refusing" to turn over Paulson's statement. The trial court's ruling was correct, as a result.

Moreover, defendant cannot show any prejudice from not having the statement. Paulson's testimony was related to only two relevant facts, her discovery of the crime scene upon arriving at work and seeing Gasperson's red Baretta heading away from the direction of the store. The purpose for obtaining the statement would be to examine it for prior inconsistent statements or omissions regarding these facts. However, notes taken by Major Freeman on the morning of the crimes show that Paulson made statements consistent with her testimony shortly after her discovery of the crime scene. Defendant could not have shown that Paulson made a prior inconsistent statement, and therefore he was not prejudiced by the loss of Paulson's state-

ment. As to defendant's assertions of constitutional error, such arguments were not raised at trial and are thereby waived on appeal. *State v. Jaynes,* 342 N.C. 249, 263, 464 S.E.2d 448, 457 (1995), ("Even alleged errors arising under the Constitution of the United States are waived if defendant does not raise them in the trial court."), *cert. denied,* —— U.S. ——, 135 L. Ed. 2d 1080 (1996); N.C. R. App. P. 10(b)(1). Defendant's assignment of error on this issue is thus overruled.

In his next assignment of error, defendant argues that he received multiple punishments for the same offense in violation of the prohibition against double jeopardy. Specifically, he contends that he was punished twice for the murders of Gasperson and Aragona, once when convicted and sentenced for their murders and again when the kidnapping conviction was elevated to first-degree based on the murders. This is based on his contention that the elevating element of first-degree kidnapping—that the victims were not released in a safe place (because they were killed)—was already the subject of the murder convictions and cannot also be the catalyst for elevating the kidnapping conviction. We disagree.

**[7]** A thorough review of the record reveals that defendant did not object at trial to the submission of first-degree kidnapping on the grounds asserted here.

> In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection or motion.

N.C. R. App. P. 10(b)(1). "Except as otherwise provided herein, the scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal in accordance with this Rule 10." N.C. R. App. P. 10(a). Accordingly, defendant has failed to preserve this issue for appellate review.

**[8]** Assuming *arguendo* that this issue had been preserved for appellate review, we conclude that double jeopardy does not preclude punishing defendant for first-degree kidnapping in this case. Both the Fifth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution protect against multiple punishments for the same offense. *State v. Rambert,* 341 N.C. 173,

175, 459 S.E.2d 510, 511-12 (1995); *State v. Gardner*, 315 N.C. 444, 451, 340 S.E.2d 701, 707 (1986). Nonetheless, this Court in *Gardner* noted that "even if the elements of the two statutory crimes are identical and neither requires proof of a fact that the other does not, the defendant may, in a single trial, be convicted of and punished for both crimes if it is found that the legislature so intended." *Gardner*, 315 N.C. at 455, 340 S.E.2d at 709 (citing, *e.g.*, *Missouri v. Hunter*, 459 U.S. 359, 74 L. Ed. 2d 535 (1983); *Albernaz v. United States*, 450 U.S. 333, 67 L. Ed. 2d 275 (1981)); *accord State v. Pipkins*, 337 N.C. 431, 446 S.E.2d 360 (1994). Such an analysis of legislative intent is not necessary in this case, however, because the offenses at issue are not the same. This Court recognized in *State v. Murray*, 310 N.C. 541, 313 S.E.2d 523 (1984), *overruled on other grounds by State v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988), that:

> [E]ven where evidence to support two or more offenses overlaps, *double jeopardy does not occur unless the evidence required to support the two convictions is identical.* If proof of an additional fact is required for each conviction which is not required for the other, even though some of the same acts must be proved in the trial of each, the offenses are not the same.

*Murray*, 310 N.C. at 548, 313 S.E.2d at 529 (emphasis added); *accord State v. Perry*, 305 N.C. 225, 287 S.E.2d 810 (1982). This is traditionally referred to as the *Blockburger* test, after the case of *Blockburger v. United States*, 284 U.S. 299, 76 L. Ed. 306 (1932), in which the Supreme Court stated:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one[] is whether each provision requires proof of a fact which the other does not.

*Id.* at 304, 76 L. Ed. at 309.

In this case, each crime charged contains an element not required to be proved in the other. First-degree murder is the unlawful killing of another human being with malice and with premeditation and deliberation. N.C.G.S. § 14-17 (1993); *State v. Watson*, 338 N.C. 168, 449 S.E.2d 694 (1994), *cert. denied*, 514 U.S. 1071, 131 L. Ed. 2d 569 (1995), *overruled on other grounds by State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995). First-degree kidnapping is (a) the unlawful, nonconsensual confinement, restraint or removal of a person for the purpose of committing certain specified acts; and (b) either the

failure to release the person in a safe place, or the injury or sexual assault of the person. N.C.G.S. § 14-39 (1993); *State v. Corley*, 310 N.C. 40, 311 S.E.2d 540 (1984). First-degree kidnapping is not a lesser-included offense of murder. It requires the State to prove facts not required to prove murder, and it addresses a distinct evil, the kidnapping of and failure to release the victim in a safe place or condition. "It is clear then, that here at least one essential element of each crime is not an element of the other. We find no merit, therefore, in the defendant's contentions that he was subjected to double jeopardy." *Murray*, 310 N.C. at 548-49, 313 S.E.2d at 529.

[9] Defendant's next assignment of error addresses instructions given the jury regarding its duties during deliberations. After being properly charged, the jury retired to deliberate. It indicated subsequently that it had reached unanimous verdicts in all cases. However, a review of the verdict sheets by the trial court revealed that the jury had found defendant guilty of first-degree murder based upon the felony murder rule, but had left blank its finding as to first-degree murder based upon premeditation and deliberation. After taking the verdicts on all other offenses, the trial court sent the jury back to the jury room to continue deliberation on the charge of first-degree murder based upon premeditation and deliberation. The jury sent a note to the trial court shortly thereafter advising that it had not reached unanimity on this charge. Upon the jury's return to the courtroom, the trial court instructed as follows:

> Mr. Ballard [foreman], as to your inquiry, which you stated that the jury is not unanimous as to its response relative to the "A" section of the verdict sheets in both cases . . . and you made inquiry do we enter "no" in that section, let me convey this to you, Ladies and Gentlemen of the Jury. That as to that particular place for the answer in 1A, your foreman has informed the court that you have so far been unable to agree upon a verdict. The court does want to emphasize the fact that it is your duty to do whatever you can to reach a verdict. You should reason the matter over together as reasonable men and women and to reconcile your differences if you can without the surrender of conscientious conviction. But no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his or her fellow jurors or for the mere purpose of returning a verdict. I will now let you resume your deliberations and see if you can reach verdicts in, relative to 1A of those particular cases.

The jury returned soon thereafter with a unanimous verdict of guilty of first-degree murder on the basis of premeditation and deliberation. Defendant contends that the trial court's instructions were erroneous under *State v. Williams*, 315 N.C. 310, 338 S.E.2d 75 (1986), because the trial court failed to give all of the jury instructions listed in N.C.G.S. § 15A-1235(b), the guidelines regarding the duty to deliberate. The crux of such argument is that instructions not following the statute verbatim might tend to coerce a jury into a verdict in favor of the prosecution. We disagree with defendant's contention.

"[I]t has long been the rule in this State that in deciding whether a court's instructions force a verdict or merely serve as a catalyst for further deliberations, an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury." *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (1985). The statutory guidelines in N.C.G.S. § 15A-1235, addressing the trial court's obligations in connection with a deadlocked jury, provide:

15A-1235. Length of deliberations; deadlocked jury.

(a) Before the jury retires for deliberation, the judge must give an instruction which informs the jury that in order to return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty.

(b) Before the jury retires for deliberation, the judge *may* give an instruction which informs the jury that:

*(1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;*

*(2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;*

*(3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and*

*(4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.*

(c) If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and *may* give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

(d) If it appears that there is no reasonable possibility of agreement, the judge may declare a mistrial and discharge the jury.

N.C.G.S. § 15A-1235 (1988) (emphasis added). In *State v. Easterling*, 300 N.C. 594, 268 S.E.2d 800 (1980), we held that this statute is the "proper reference for standards applicable to charges which may be given a jury that is apparently unable to agree upon a verdict." *Id.* at 608, 268 S.E.2d at 809. However, "[i]t is clearly within the sound discretion of the trial judge as to whether to give an instruction pursuant to N.C.G.S. § 15A-1235(c)." *Williams*, 315 N.C. at 326-27, 338 S.E.2d at 85. This is because § 15A-1235(c) is permissive rather than mandatory. *Id.* at 326, 338 S.E.2d at 85; *Peek*, 313 N.C. at 211, 328 S.E.2d at 253. The plain language of the statute provides that the trial court "*may* give or repeat the instructions provided in subsections (a) and (b)." N.C.G.S. § 15A-1235(c) (emphasis added).

An examination of the circumstances under which the instructions were made, and of the instructions themselves, establishes that the trial court's instructions in this case merely served as a catalyst for further deliberations and did not force a verdict. The jury left blank the verdict on the issue of premeditation and deliberation. The trial court returned the jury for further deliberation. After a short time, the jury indicated it had not reached a verdict. The jury did not, however, indicate that it was hopelessly deadlocked. The trial court then gave the instruction at issue, and the jury deliberated further on the issue of premeditation and deliberation alone. The trial court's instructions did not suggest that jurors should surrender their beliefs or include extraneous references to the expense and inconvenience of another trial, as has been found erroneous by this Court. *See, e.g.*, *State v. Lipfird*, 302 N.C. 391, 276 S.E.2d 161 (1981); *State v. Alston*, 294 N.C. 577, 243 S.E.2d 354 (1978). Subsequently, the jury was able to reach a verdict without undue delay and also without unreasonable haste. These circumstances do not evidence the types of judicial conduct held to be coercive by our previous rulings.

Moreover, by comparing the trial court's instructions with those contained in Section 15A-1235 above, it is clear that the trial court's

instructions contained the substance of the statutory instructions. The instructions fairly apprised the jurors of their duty to reach a consensus after open-minded debate and examination without sacrificing their individually held convictions merely for the sake of returning a verdict. Thus, these instructions cannot be said to have forced a verdict in favor of the prosecution. As such, the instructions are not violative of the statute or this Court's precedent in *Williams*.

[10] Defendant's suggestion that the trial court must read N.C.G.S. § 15A-1235(b) verbatim is misplaced. Such is not required by the express language of the statute or by *Williams*. In *Williams*, Justice Meyer wrote that "whenever the trial judge gives the jury any of the instructions authorized by N.C.G.S. § 15A-1235(b), whether given before the jury initially retires for deliberation or after the trial judge concludes that the jury is deadlocked, he must give all of them." *Williams*, 315 N.C. at 327, 338 S.E.2d at 85. No authority mandates a word-for-word recital of the statute. Of course, "[c]lear violations of the procedural safeguards contained in G.S. 15A-1235 cannot be lightly tolerated by the appellate division. Indeed, it should be the rule rather than the exception that a disregard of the guidelines established in the statute will require a finding on appeal of prejudicial error." *Easterling*, 300 N.C. at 609, 268 S.E.2d at 809-10. However, in situations where the trial court perceives the jury may be deadlocked or may be having some difficulty reaching unanimity, and the trial court in its discretion gives further instruction, no "clear violation" of the statute will be found to exist as long as the trial court gives the substance of the four instructions found in N.C.G.S. § 15A-1235(b). Any inference from *Williams* to the contrary is disavowed. This assignment of error is overruled.

[11] In his final assignment of error, defendant contends that the trial court erred by failing to sustain objections to and by failing to intervene *ex mero motu* to correct certain jury arguments made by the State on closing argument. During closing argument, the prosecutor argued to the jury that the defendant had sex with the female victim the night she was kidnapped, and that the male victim witnessed the assault and suffered lacerations to his face as he reacted to it. The prosecution also gave a description of the indignities suffered by a murder victim as described in a book and asked the jurors to remember that the victims would not be bearing any grandchildren for their parents. Defendant objected at trial to the arguments regarding the lacerations and the indignities suffered by the victims. Defendant asserts that the trial court erred by failing to sustain

defendant's objections to these arguments on the ground that they were not supported by competent evidence. Defendant did not object to the arguments regarding the sexual assault and the fact there would be no grandchildren. Defendant submits that the trial court erred by failing to intervene *ex mero motu* to correct these arguments since the arguments were made solely to elicit mercy, pity and a sense of obligation to the victims' families from the jury.

In *State v. Worthy*, 341 N.C. 707, 462 S.E.2d 482 (1995), this Court summarized the law governing closing arguments:

> It is well settled that arguments of counsel rest within the control and discretion of the presiding trial judge. *State v. Soyars*, 332 N.C. 47, 418 S.E.2d 480 (1992); *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986). In the argument of hotly contested cases, counsel is granted wide latitude. *Williams*, 317 N.C. at 481, 346 S.E.2d at 410. While it is not proper for counsel to "travel outside the record" and inject his or her personal beliefs or other facts not contained within the record into jury arguments, or place before the jury incompetent or prejudicial matters, counsel may properly argue all the facts in evidence as well as any reasonable inferences drawn therefrom. *State v. Monk*, 286 N.C. 509, 212 S.E.2d 125 (1975).

> Additionally, as this Court has previously pointed out, "for an inappropriate prosecutorial comment to justify a new trial, it 'must be sufficiently grave that it is prejudicial error.' " In order to reach the level of "prejudicial error" in this regard, it now is well established that the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

> *State v. Green*, 336 N.C. 142, 186, 443 S.E.2d 14, 40 (citations omitted), *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Moreover, "prosecutorial statements are not placed in an isolated vacuum on appeal." *State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995).

*Worthy*, 341 N.C. at 709-10, 462 S.E.2d at 483-84. Also, alleged error in the prosecution's arguments must be evaluated in the context of the

defendant's arguments. *State v. Gladden*, 315 N.C. 398, 423, 340 S.E.2d 673, 689, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). Finally, where a party does not object to a jury argument, the allegedly improper argument must be so prejudicial and grossly improper as to interfere with defendant's right to a fair trial in order for the trial court to be found in error for failure to intervene *ex mero motu*. *State v. Alford*, 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995).

When measured by these standards, a thorough examination of the record establishes that the prosecution's statements in this case do not rise to such a level as to constitute an interference with defendant's right to a fair trial. Regarding the argument that the defendant had sex with Aragona, the evidence that defendant told a fellow inmate that he and his son had sex with Aragona supports such an argument. The argument that Gasperson suffered lacerations during his reaction to the assault of Aragona was a permissible, reasonable inference drawn from the evidence of sexual assault and the presence of lacerations on the face of Gasperson. The reference to the book about indignities suffered by murder victims was dropped immediately after objection. However, the evidence of Gasperson's being bound in a fetal position and shot in the head, of Aragona's being sexually assaulted and shot in the head, of Aragona's remains being scattered in the woods, of their possessions being taken by defendants, and of their most private spaces becoming the subject of public analysis supports the argument that they suffered extreme personal indignities as murder victims. Finally, the argument that their parents would not have grandchildren because of the killings was factually undeniable, and the point was not belabored by the prosecution. Thus, we hold that the prosecution's arguments did not rise to such a level as to deny defendant due process of law, and this assignment of error is overruled.

For the foregoing reasons, we hold that defendant received a fair trial, free of prejudicial error.

NO ERROR.