IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-148

No. COA20-171

Filed 20 April 2021

Pitt County, No. 17 CRS 55384

STATE OF NORTH CAROLINA

v.

JODY RAYE STEELE, Defendant.

Appeal by Defendant from an order entered on 10 January 2020 and judgment entered on 25 October 2019 by Judge J. Carlton Cole in Pitt County Superior Court. Heard in the Court of Appeals 27 January 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Nora F. Sullivan, for the State.*

*The Robinson Law Firm, P.A., by Leslie S. Robinson, for the Defendant.*

JACKSON, Judge.

¶ 1    The issue in this case is whether a driver is "seized" within the meaning of the Fourth Amendment when he is tailed by a marked police cruiser down empty streets at 3 a.m., followed into an empty parking lot, and then hailed down by the officer's hand gestures. Because we conclude that no reasonable person would believe he was free to go under such circumstances, we hold that Defendant was seized for purposes of the Fourth Amendment and that the trial court erred in denying his motion to

suppress.

## I. Factual and Procedural Background

Our only record of what occurred on the night of Defendant's arrest comes from the testimony of Officer Michael Plummer of the East Carolina University ("ECU") Police Department and a partial video of the stop. During the suppression hearing, Officer Plummer described his encounter with Defendant, which occurred in the early morning hours of 2 August 2017 while he was on patrol duty in Greenville, North Carolina. Officer Plummer was uniformed and driving in his patrol car that night, which had light strips and insignias identifying it as an ECU Police Department vehicle.

At 2:50 a.m., Officer Plummer received a dispatch advising that the county police were requesting assistance for a vehicle crash on Charles Boulevard, and began heading that way. As he was traveling south on Charles Boulevard, approaching the intersection of Charles and 14th Street, he noticed a yellow Camaro make a left turn from 14th Street and turn onto Charles heading south (the same direction he was heading in his cruiser). There was no other traffic on the road at that time—just the yellow Camaro, and Officer Plummer traveling behind it. He testified that he noticed that the Camaro "appeared to have its daytime running lights on" but that "no rear lights were illuminated."

Officer Plummer began following the Camaro as it proceeded south down

Charles and made another left onto Ficklen Drive, at the same time radioing dispatch to ascertain whether or not the Camaro might have been involved in the accident. He continued following the Camaro down Ficklen Drive as it pulled into an on-campus parking lot. The parking lot was totally empty when the two vehicles arrived.

¶ 5        Once inside the parking lot, Officer Plummer observed the Camaro as it "made a u-turn" and began circling back towards the parking lot entrance. At that point, Officer Plummer approached the Camaro, driving toward it as the Camaro was headed the opposite direction out of the lot. Officer Plummer pulled up close enough that the cars were positioned "driver's door to driver's door," approximately three to four feet apart. As he was positioning his vehicle, Officer Plummer also rolled down his window and "stuck [his] hand out the car to flag [the driver of the Camaro] down." Specifically, Officer Plummer stated that he "rested [his] forearm on the door – on the window frame and waved [his] hand up and down." As he reached the driver's door of the Camaro and gestured, both vehicles "mutually came to a stop." At this point he had not activated his blue lights or siren.

¶ 6        Officer Plummer then began speaking with the driver to see "if he had possibly been through the area and seen anything in relation to the vehicle crash." After Defendant replied, Officer Plummer began to suspect that Defendant had been drinking. He then asked Defendant to get out of the vehicle, performed several field sobriety tests, and eventually arrested and cited Defendant for impaired driving.

¶ 7          On 2 March 2018, Defendant filed a motion to suppress in Pitt County District Court, challenging the stop of his vehicle as an unlawful seizure and detention. The district court ultimately denied his motion to suppress, and on 17 April 2019 he was found guilty of impaired driving and sentenced to twelve months of unsupervised probation in addition to a sixty-day suspended sentence. Defendant appealed the district court's judgment to Pitt County Superior Court on 18 April 2019. On 23 May 2019, Defendant filed a new motion to suppress in the superior court, again challenging the stop of his vehicle as an unlawful seizure and detention. The superior court heard arguments on Defendant's motion to suppress on 25 October 2019. Officer Plummer was the only witness who testified at the hearing.

¶ 8          At the conclusion of the hearing, the trial court determined that the encounter between Defendant and Officer Plummer was not a traffic stop, because Officer Plummer had not indicated to Defendant that he was not free to leave. The trial court accordingly denied Defendant's motion to suppress. Defense counsel then announced Defendant's intent (which had been previously communicated to the State) to enter a guilty plea following the denial of his motion to suppress. Defendant subsequently pleaded guilty to driving while impaired. The trial court again imposed a suspended sixty-day sentence and placed Defendant on unsupervised probation for twelve months.

¶ 9          Defendant gave oral notice of appeal in open court and filed a written notice of

appeal with this Court on 4 November 2019. On 10 January 2020, the trial court

entered a written order denying Defendant's motion to suppress that included the

following pertinent Findings of Fact:

> 4. That Officer Plummer saw the Defendant's vehicle and observed that the Defendant's vehicle appeared to have its daytime running lights on for the headlights, but the rear lights were not illuminated.
>
> 5. That the lack of illuminated rear lights on the Defendant's vehicle drew Officer Plummer's attention to the vehicle.
>
> . . . .
>
> 13. That after Officer Plummer followed the Defendant's vehicle into the parking lot, the Defendant's vehicle made a U-turn and began traveling towards Officer Plummer's vehicle.
>
> 14. That Officer Plummer drove driver's door to driver's door with the Defendant's vehicle, with Officer Plummer's vehicle facing the opposite direction as the Defendant's vehicle.
>
> 15. That as Officer Plummer pulled alongside the Defendant's vehicle, Officer Plummer extended his hand out of his driver's window, rested his forearm on his driver's door, and waved his hand up and down.
>
> 16. That Officer Plummer testified that his intention was to engage in a voluntary consensual conversation with the Defendant.
>
> 17. That as Officer Plummer reached the driver's door of the Defendant's vehicle, both vehicles came to a stop and the Defendant rolled down his window.

. . .

19.     That Officer Plummer was approximately three to four feet away from the Defendant as they spoke.

20.     That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, no other officers or patrol vehicles were on scene.

21.     That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not engaged his blue lights or siren.

22.     That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not positioned his patrol vehicle in a manner that would obstruct the Defendant's vehicle from exiting the parking lot nor restrict his movement in any way.

23.     That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not directed the Defendant to get out of the Defendant's vehicle nor restricted the Defendant's freedom of movement in any way.

24.     That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not indicated to the Defendant that the Defendant was in custody or that the Defendant was not free to leave.

25.     That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not exited his patrol vehicle, taken any enforcement action, given any orders or commands to the Defendant, nor displayed any weapon or demonstrated any other show of authority to indicate that this was a traffic stop.

26.     That during the conversation with the Defendant,

Officer Plummer observed factors that ultimately led Officer Plummer to investigate and arrest the Defendant for Driving While Impaired.

Based on these findings, the trial court concluded as a matter of law:

4. That pursuant to *State v. Wilson*, this Court has considered the factors that Officer Plummer was alone when he encountered the Defendant, that Officer Plummer did not draw his weapon, that Officer Plummer did not activate his lights or siren on his patrol car, that Officer Plummer did not do or say anything to indicate to the Defendant that the Defendant was required to stop, and that the Defendant was in the Defendant's own vehicle and could have driven around Officer Plummer's patrol car.

5. That Officer Plummer had not initiated a traffic stop at the time of his conversation with the Defendant.

6. That Officer Plummer's conversation with the Defendant was a voluntary, consensual conversation between Officer Plummer and the Defendant at a time when the Defendant's freedom of movement was not restricted, and Officer Plummer had made no show of authority to indicate that the interaction was a traffic stop or that the Defendant was under arrest.

7. That the Defendant was not seized under the Fourth Amendment when he voluntarily stopped his own vehicle in the parking lot next to Officer Plummer's patrol vehicle and began conversing with Officer Plummer.

## II. Analysis

### A. Standard of Review

On appeal of an order denying a motion to suppress, we conduct a two-part review: (1) to determine whether there is "competent evidence" to support the trial

court's findings of fact, and (2) to determine whether "those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). If the findings of fact are supported by substantial competent evidence, then they are binding on appeal. *State v. Gabriel*, 192 N.C. App. 517, 519, 665 S.E.2d 581, 584 (2008). However, the trial court's conclusions of law are reviewed de novo. *State v. Edwards*, 185 N.C. App. 701, 702, 649 S.E.2d 646, 648 (2007).

**B. Challenged Findings of Fact**

¶ 11        Defendant raises several challenges to the findings of fact contained in the trial court's order. Defendant first challenges Finding of Fact 16, which states that "Officer Plummer testified that his intention was to engage in a voluntary consensual conversation with the Defendant." Defendant contends that this is not a proper finding of fact because it does nothing more than recite the testimony of a witness. We agree.

¶ 12        As our Supreme Court has previously held, although "recitations of testimony may properly be included in an order denying suppression, they cannot substitute for findings of fact resolving material conflicts." *State v. Lang*, 309 N.C. 512, 520, 308 S.E.2d 317, 321 (1983). In other words, when there is a material conflict in the evidence regarding a certain issue, it is improper for the trial court to make findings which "do not resolve conflicts in the evidence but are merely statements of what a

particular witness said." *Id*. *See also Huffman v. Moore Cty.*, 194 N.C. App. 352, 359, 669 S.E.2d 788, 792-93 (2008) (holding that factual findings are improper when they "merely recite or summarize witness testimony" but do not actually state what the court "finds the facts to be").

¶ 13    Here, there was a material conflict in the evidence regarding whether or not Officer Plummer's encounter with Defendant was a "voluntary consensual conversation" or was instead a traffic stop—in fact, this is the primary issue of contention in this case as a whole. Officer Plummer maintains that his flagging down of Defendant in the parking lot was a non-coerced, consensual encounter; while Defendant maintains that any reasonable person would realize that this was a compulsory traffic stop. Accordingly, due to this material conflict it was improper for the trial court to make findings that simply summarized the testimony of Officer Plummer on this key issue. We hold that Finding of Fact 16 does not support the trial court's conclusions of law because it does not resolve a material conflict in the evidence.

¶ 14    Defendant also challenges Findings of Fact 24 and 25, which provide as follows:

> 24.    That at the time the Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not indicated to the Defendant that the Defendant was in custody or that the Defendant was not free to leave.
>
> 25.    That at the time the Defendant stopped his vehicle

and engaged in a conversation with Officer Plummer, Officer Plummer had not exited his patrol vehicle, taken any enforcement action, given any orders or commands to the Defendant, nor displayed any weapon or demonstrated any other show of authority to indicate that this was a traffic stop.

¶ 15    We agree with Defendant that these two factual findings are improper because they are in reality mislabeled conclusions of law. As we have previously explained, any finding which requires "the exercise of judgment or the application of legal principles is more properly classified as a conclusion of law." *Lamm v. Lamm*, 210 N.C. App. 181, 189, 707 S.E.2d 685, 691 (2011) (internal marks and citation omitted). Consequently, "[a] finding of fact that is essentially a conclusion of law will be treated as a fully reviewable conclusion of law on appeal"—and will be subjected to de novo review. *Id.*

¶ 16    Here, findings 24 and 25 encompass two important conclusions of law— namely, whether or not Officer Plummer had indicated to Defendant that he was free to leave; and whether or not Officer Plummer had made a show of authority to indicate that this was a traffic stop. Both of these conclusions involve the exercise of judgment and the application of legal principles under the Fourth Amendment. Thus, findings 24 and 25 must be treated as conclusions of law and subjected to de novo review. Accordingly, we review these two findings in the subsequent section of this opinion, together with the trial court's other conclusions of law.

¶ 17        Finally, Defendant challenges a set of findings involving the operation of his vehicle's headlights. Specifically, Findings of Fact 4 and 5 provide:

> 4.       That Officer Plummer saw the Defendant's vehicle and observed that the Defendant's vehicle appeared to have its daytime running lights on for the headlights, but the rear lights were not illuminated.
>
> 5.       That the lack of illuminated rear lights on the Defendant's vehicle drew Officer Plummer's attention to the vehicle.

¶ 18        Defendant asserts that these findings are both inaccurate because the record contains irrefutable evidence contradicting Officer Plummer's testimony that the Camaro had no functioning rear lights. Most notably, Defendant points to the fact that the Camaro was a new vehicle with automatic lights; and the video footage of his arrest which shows that the Camaro's headlights and rear lights were illuminated as soon as the vehicle was turned on.

¶ 19        Though we are inclined to agree with Defendant that findings 4 and 5 are unsupported by the record, ultimately there is no need to analyze these findings because they are not dispositive to the question of whether Defendant was seized at the relevant time within the meaning of the Fourth Amendment. The issue of whether Defendant's taillights were illuminated is irrelevant because the trial court's ruling did not turn on whether Officer Plummer had reasonable suspicion to pull over Defendant for a traffic stop. Instead, as explained below, the dispositive issue is

whether this encounter qualified as a traffic stop at all (as opposed to a voluntary encounter which did not implicate the Fourth Amendment).

## C. Challenged Conclusions of Law—Motion to Suppress

¶ 20 Defendant argues that the trial court erred in denying his motion to suppress, contending that the traffic stop initiated by Officer Plummer was an unreasonable seizure under the Fourth Amendment. The trial court made the following conclusions of law in determining that Defendant was not seized by Officer Plummer under the Fourth Amendment:

> 2. That the only matter before this Court is whether the Defendant was seized under the Fourth Amendment when he voluntarily stopped his own vehicle in the parking lot next to Officer Plummer's patrol vehicle and began conversing with Officer Plummer; and if so, whether the seizure was lawful.
>
> 3. That the Court has reviewed and considered *State v. Wilson*, 793 S.E.2d 737 (2016), in making its findings and conclusions.
>
> 4. That pursuant to *State v. Wilson*, this Court has considered the factors that Officer Plummer was alone when he encountered the Defendant, that Officer Plummer did not draw his weapon, that Officer Plummer did not activate his lights or siren on his patrol car, that Officer Plummer did not do or say anything to indicate to the Defendant that the Defendant was required to stop, and that the Defendant was in the Defendant's own vehicle and could have driven around Officer Plummer's patrol car.
>
> 5. That Officer Plummer had not initiated a traffic stop at the time of his conversation with the Defendant.

> 6. That Officer Plummer's conversation with the Defendant was a voluntary, consensual conversation between Officer Plummer and the Defendant at a time when the Defendant's freedom of movement was not restricted, and Officer Plummer had made no show of authority to indicate that the interaction was a traffic stop or that the Defendant was under arrest.
>
> 7. That the Defendant was not seized under the Fourth Amendment when he voluntarily stopped his own vehicle in the parking lot next to Officer Plummer's patrol vehicle and began conversing with Officer Plummer.

¶ 21 Ultimately, we agree with Defendant that the trial court erred in concluding that the encounter between himself and Officer Plummer was not a seizure under the Fourth Amendment. The Fourth Amendment of the United States Constitution protects "the right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend IV. Article I, § 20 of the North Carolina Constitution likewise "protect[s] against unreasonable searches and seizures." *State v. Otto*, 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012). "Fourth Amendment rights are enforced primarily through 'the exclusionary rule,' which provides that evidence derived from an unconstitutional search or seizure is generally inadmissible in a criminal prosecution of the individual subjected to the constitutional violation." *State v. McKinney*, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006).

¶ 22 It is well-established that "a traffic stop is considered a 'seizure' within the meaning of" both the federal and state constitutions, and that a traffic stop is only

constitutional if supported by reasonable suspicion. *Otto*, 366 N.C. at 136-37, 726 S.E.2d at 827. However, the issue in this case is not whether Officer Plummer had reasonable suspicion to stop Defendant—rather, the issue is whether the encounter between Defendant and Officer Plummer was a traffic stop (i.e., a seizure) at all.

¶ 23 Not every interaction between citizens and law enforcement constitutes a seizure. The United States Supreme Court has "repeatedly held that mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). *See also State v. Brooks*, 337 N.C. 132, 141, 446 S.E.2d 579, 585 (1994) (internal marks and citation omitted) (explaining that "communication between the police and citizens involving no coercion or detention" does not constitute a seizure). Thus, officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *State v. Isenhour* 194 N.C. App. 539, 542, 670 S.E.2d 264, 267 (2008) (internal marks and citation omitted).

¶ 24 In contrast, a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 20 n. 16 (1968). *See also State v. West*, 119 N.C. App. 562, 566, 459 S.E.2d 55, 58 (1995) ("A seizure does not occur until there is a physical application of force or submission to a show of authority."). Here, Defendant is not contending that Officer Plummer used a physical application of force to stop his vehicle—but rather

that Officer Plummer made a show of authority which compelled him to stop.

¶ 25        A show of authority constitutes a seizure when "under the totality of the circumstances a reasonable person would feel that he was not free to decline the officers' request or otherwise terminate the encounter." *Brooks*, 337 N.C. at 142, 446 S.E.2d at 586. *See also Bostick*, 501 U.S. at 437 (a show of authority occurs when the officer's conduct "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business") (internal marks and citation omitted). When a sufficient show of authority is made, it is possible for an officer to seize a person without ever laying hands on that person. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (noting that when there is "an assertion of authority" by an officer, "no actual, physical touching is essential" for the encounter to qualify as a seizure) (internal marks and citation omitted).

¶ 26        In determining whether a show of authority has occurred, relevant circumstances include "the number of officers present, whether the officer displayed a weapon, the officer's words and tone of voice, any physical contact between the officer and the individual, whether the officer retained the individual's identification or property, the location of the encounter, and whether the officer blocked the individual's path." *State v. Icard*, 363 N.C. 303, 309, 677 S.E.2d 822, 827 (2009). What constitutes a seizure "will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*,

486 U.S. 567, 573 (1988).

¶ 27        The present case is somewhat unique in that Defendant was hailed by Officer Plummer while they were both driving in separate vehicles, as opposed to walking down the street. Seizure cases most typically involve a defendant who is approached by an officer on foot while in a public location. *See, e.g., Brooks*, 337 N.C. at 142, 446 S.E.2d at 586 (no seizure when defendant was seated in a parked, open-door vehicle in a public parking lot and approached by an officer on foot); *Isenhour*, 194 N.C. App. at 544, 670 S.E.2d at 268 (no seizure when defendant was seated in a parked vehicle in a public parking lot and officers approached the car on foot). We are unable to find any caselaw in this state specifically addressing whether a seizure occurs when an officer hails down an individual while both are piloting moving vehicles.

¶ 28        However, the trial court (as well as the dissenting opinion in this case) ignored this key distinction in its analysis and instead relied exclusively on cases involving on-foot encounters. For example, the dissent first discusses *Brooks*, wherein we held that no seizure occurred when the defendant was approached by officer on foot while the defendant was seated in a parked, open-door vehicle in a public parking lot. 337 N.C. at 137, 446 S.E.2d at 583. The officer greeted the defendant and, after spying an empty holster in the car, asked defendant where the gun was, leading to a search of the car and the defendant's arrest. *Id.*

¶ 29        The dissent similarly relies on *Williams*, wherein an officer began following a

vehicle in his patrol car because he suspected the vehicle's 30-day tag was expired. *State v. Williams*, 201 N.C. App. 566, 567, 686 S.E.2d 905, 906 (2009). As the officer ran the tag in his computer, he noticed the defendant pull into a driveway. *Id.* The officer pulled over to the curb on the opposite side of the street, approached the vehicle, and inquired with the defendant about the status of his 30-day tag. *Id.* We held that this was not a seizure, because the officer "did not initiate a traffic stop," and the defendant "did not pull into the driveway as a result of any show of authority from" the officer. *Id.* at 570, 686 S.E.2d at 908. We noted that the officer approached on foot, that he "did not physically block Defendant's vehicle from leaving the scene," that he did not activate his sirens or lights, and that he did not use "any language or . . . demeanor suggesting that Defendant was not free to leave." *Id.* at 571, 686 S.E.2d at 909.

¶ 30        Finally, the trial court relied heavily on *Wilson*, wherein an officer parked his patrol car across the street from a residence after receiving a tip that a wanted suspect would be there. *State v. Wilson*, 250 N.C. App. 781, 782, 793 S.E.2d 737, 738 (2016), *aff'd per curiam*, 370 N.C. 389, 808 S.E.2d 266 (2017). As the officer parked, he saw a pickup truck beginning to exit the driveway of the residence, and he walked over intending to speak to the driver, while he "waved his hands back and forth just above shoulder level to tell [the defendant] to stop the vehicle." *Id.* We held that this did not constitute a seizure, noting that (1) the officer "did not approach [the

defendant] in a confined space"; (2) the defendant's "movement was not restricted" given that the defendant "was in a truck while Officer Johnson was on foot"; (3) "Officer Johnson was alone on the scene, he did not draw his weapon, and his lights and sirens were off"; and (4) the officer "did not touch [the defendant] or use any language or tone which would indicate that compliance with his request would be compelled." *Id*. at 785-86, 793 S.E.2d at 741.

¶ 31    There are several key differences between the present case and these three cases: (1) the fact that this encounter involved two moving vehicles; (2) the time and location of the encounter; and (3) Officer Plummer's use of authoritative gestures to hail down Defendant's vehicle.

¶ 32    First and most notably, Defendant here was followed and hailed by Officer Plummer while both were driving in moving motor vehicles—unlike in *Brooks*, *Williams*, and *Wilson*, where an officer approached a stationary vehicle on foot. There is an important legal distinction between an officer who tails and waves down a moving vehicle in his patrol car; and an officer who walks up to a stationary vehicle on foot. In the latter scenario, the officer has taken no actions to impede the movement of the defendant—whereas in the former scenario, the officer's show of authority has obligated the defendant to halt the movement of his vehicle in order to converse with the officer. As the United States Supreme Court has previously explained, "stopping or diverting an automobile in transit, with the attendant

opportunity for a visual inspection of areas of the [vehicle] not otherwise observable, is *materially more intrusive* than a question put to a passing pedestrian." *United States v. Mendenhall*, 446 U.S. 544, 556-57 (1980) (emphasis added).

¶ 33        Moreover, a reasonable motorist would surely feel less at liberty to "ignore the police presence and go about his business" when waved down by an officer in a moving patrol car. *Bostick*, 501 U.S. at 437. In fact, in such a situation most people would feel compelled to slow down and speak with the officer, knowing that ignoring the request would only end in trouble.

¶ 34        This becomes especially apparent when one examines the criminal consequences that might follow when a person ignores an officer's request in such a scenario. For example, N.C. Gen. Stat. § 20-114.1(a) makes it unlawful for any person to "willfully fail or refuse to comply with any lawful order or direction of any law-enforcement officer[,] . . . which order or direction related to the control of traffic." N.C. Gen. Stat. § 20-114.1(a) (2019). We have previously upheld a conviction under this statute when a defendant ignored an officer's request to drive in a certain lane as the officer was directing traffic. *See State v. Satterfield*, 166 N.C. App. 282, 603 S.E.2d 167, 2004 WL 1964874, at *1-2 (2004) (unpublished).

¶ 35        Similarly, N.C. Gen. Stat. § 14-223 makes it unlawful to "willfully and unlawfully resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office." N.C. Gen. Stat. § 14-223 (2019). We have previously

upheld a conviction under this statute when officers approached a defendant in his improperly stopped vehicle, but the defendant wouldn't roll down his window, refused to speak with them, and acted uncooperatively. *See State v. Hoque*, 269 N.C. App. 347, 349-50, 837 S.E.2d 464, 468-69 (2020).

¶ 36 These cases illustrate that a person in Defendant's situation finds himself caught in a Catch-22—comply with the officer's requests, and relinquish your Fourth Amendment rights; or ignore the officer's requests, and be arrested for resisting a public officer. This cannot be consistent with the guarantees in the Fourth Amendment and Article I, § 20 of the North Carolina Constitution. We conclude that when a person would likely face criminal charges for failing to comply with an officer's "request," then that person has been seized within the meaning of the Fourth Amendment and Article I, § 20 of our state Constitution.

¶ 37 In addition to erroneously ignoring the inherently coercive nature of an officer hailing down a moving vehicle while in a marked patrol car, the trial court's analysis failed to adequately account for the time and location of this encounter. *See Icard*, 363 N.C. at 309, 677 S.E.2d at 827 (holding that the location and physical circumstances of the encounter are relevant seizure factors). Here, Officer Plummer first spotted Defendant's vehicle on an otherwise empty street at around three in the morning. He then tailed Defendant as Defendant proceeded down Charles Boulevard for some time, made two different left turns, and then entered a campus parking lot—

a large paved lot that was completely empty. A reasonable person would find such an empty, isolated location at such a late time of night to be intimidating, and would be more susceptible to police pressure which he or she otherwise might have felt free to ignore in a sunlit, crowded location.

¶ 38          Finally, the trial court overlooked the authoritative physical gestures made by Officer Plummer indicating that he wished Defendant to stop and speak with him. Authoritative gestures made by an officer (or the lack thereof) can be a significant factor in determining whether or not a seizure occurred. *See, e.g., State v. Wilson*, 198 N.C. App. 406, 681 S.E.2d 565, 2009 WL 2177694, at *3 (2009) (unpublished) (holding that no seizure had occurred when the officers "made no gestures that Defendant could have reasonably interpreted as an order to stop" as they approached his car); *State v. Hazel*, 262 N.C. App. 373, 820 S.E.2d 132, 2018 WL 5796274, at *6 (2018) (unpublished) (holding that no seizure had occurred when the officer did not "make any authoritative gestures or commands" as he parked his car near the defendant's and asked to speak with him). Moreover, Officer Plummer was uniformed, presumably carrying a weapon, and was driving in his clearly-marked patrol vehicle. *See State v. Knudsen*, 229 N.C. App. 271, 282, 747 S.E.2d 641, 649 (2013) ("Several North Carolina Supreme Court opinions have also found the fact that an officer was in uniform to be a significant factor to consider when determining whether a seizure has occurred.").

¶ 39        In sum, when one examines all the attendant circumstances surrounding this encounter, the only reasonable conclusion is that Defendant was seized by Officer Plummer—especially when one examines this encounter from Defendant's perspective. Around 3:00 in the morning on 2 August 2017, Defendant was driving down Charles Boulevard when a police cruiser pulled up directly behind him and began tailing him down the street. The street was completely empty aside from these two vehicles. The cruiser continued to follow directly behind him as he turned left onto Ficklen Drive, and then made another turn into a campus parking lot. Even at this early point in the encounter, after being tailed by a police car down empty streets into an empty parking lot, any reasonable person would have realized that they are the target of police suspicion and are likely to be imminently pulled over.

¶ 40        The intimidating nature of this encounter was further amplified once the two vehicles reached the deserted parking lot. As Defendant made a U-turn and attempted to leave the parking lot, the patrol car rolled down its window, and the officer waved his hands in a clear indication that he wished Defendant to stop. Defendant slowed, and the patrol car pulled up right next to him, such that the two drivers were facing each other, only three to four feet apart.

¶ 41        Thus, it is evident that Defendant stopped his vehicle's motion in direct response to Officer Plummer's authoritative conduct and commanding gestures. This becomes especially apparent when one considers how a reasonable person would have

reacted if a *non-police* vehicle had followed them down public streets into an empty parking lot at 3 a.m. and then gestured for them to stop. No reasonable person would likely comply with such a request coming from a stranger—making it even more apparent that the only reason Defendant stopped here was due to Officer Plummer's display of authority.

¶ 42        Moreover, although the subjective point of view of the officer is not by itself a dispositive factor in the seizure analysis, we cannot wholly ignore the telling descriptions of this encounter which were provided by Officer Plummer himself. Officer Plummer testified that his purpose in waving down the Camaro was to get the driver to comply with his directive and stop so that he could speak with him. Moreover, in Officer Plummer's written field report of this encounter (which he prepared that day), he expressly described his meeting with Defendant as a "traffic stop." Defendant's statements during the encounter (as shown by the video) indicate that he too considered this encounter to be a non-consensual traffic stop—repeatedly asking Officer Plummer "what did I get pulled over for?"

## III.    Conclusion

¶ 43        Thus, after examining all the attendant facts and circumstances, we conclude that no reasonable person in Defendant's position would have felt free to ignore Officer Plummer's show of authority. Accordingly, we hold that Defendant was seized within the meaning of the Fourth Amendment and Article I, § 20 of the North

Carolina Constitution, and that the trial court erred in denying Defendant's motion to suppress. We reverse the trial court's order denying the motion to suppress and remand back to the trial court for a new determination on whether Officer Plummer possessed reasonable suspicion to conduct this traffic stop.

REVERSED AND REMANDED.

Judge CARPENTER concurs.

Judge HAMPSON dissents by separate opinion.

HAMPSON, Judge, dissenting.

The majority correctly identifies the issue that was before the trial court. The issue before this Court on appeal, however, is whether the trial court's Findings of Fact are supported by competent evidence in the Record and whether those Findings support its Conclusions of law. Because the trial court's Findings are supported by evidence and, consistent with our existing jurisprudence, in turn support the trial court's Conclusions of law, I would affirm the trial court. Accordingly, I dissent.

## I. Factual and Procedural Background

Defendant was arrested and cited for Driving While Impaired on 2 August 2017. On 17 April 2019, Defendant was found guilty of Driving While Impaired in Pitt County District Court and received a sixty-day sentence suspended upon his completion of twelve months of unsupervised probation.

Defendant appealed the District Court's Judgment to the Superior Court on 18 April 2019. On 23 May 2019, Defendant filed a Motion to Suppress in Superior Court arguing the evidence against him was the result of an unlawful traffic stop and seizure. The trial court heard Defendant's Motion to Suppress on 25 October 2019. Officer Michael Plummer (Officer Plummer), of the East Carolina University Police Department, was the only witness who testified at the hearing.

Officer Plummer testified that on 2 August 2017, at approximately 2:50 a.m., he was driving his marked patrol vehicle on East 10th Street in Greenville, North Carolina. At that time, Officer Plummer received a call from dispatch requesting

assistance with a vehicle crash on Charles Boulevard. Officer Plummer stated, as he approached the intersection of 14th Street and Charles Boulevard, he saw a yellow Camaro turn left from 14th Street onto Charles Boulevard. Officer Plummer followed the yellow Camaro which, according to Officer Plummer, "appeared to have its daytime running lights on for the headlights but no rear lights were illuminated." Officer Plummer testified the Camaro turned left onto Ficklen Drive and then turned right into a large parking lot—with Officer Plummer following.

¶ 48        Officer Plummer stated the Camaro executed a "u-turn and was coming back" towards Officer Plummer's vehicle in the parking lot. Officer Plummer testified the parking lot was empty except for the Camaro and Officer Plummer's patrol vehicle. Officer Plummer drove toward the approaching Camaro and positioned his patrol vehicle such that the driver's sides of both vehicles were parallel to one another. Officer Plummer, in uniform at the time, rolled down his driver's window and "rested [his] forearm on the door — on the window frame and waved [his] hand up and down" in order to get the Camaro to stop. Officer Plummer testified he had not activated his blue lights or sirens, nor given any verbal commands to the driver of the Camaro at any point prior to Officer Plummer waving his hand.

¶ 49        The Camaro came to a stop with the driver's windows of both vehicles near and facing each other. According to Officer Plummer, the vehicles were "[t]hree to four feet" apart. Officer Plummer explained he "began speaking with the driver to see if

he had possibly been through the area and seen anything in relation to the vehicle crash that [police] were responding to." During the hearing, Officer Plummer identified Defendant as the driver of the Camaro. Officer Plummer testified he had not indicated to Defendant that Defendant was not free to leave nor did he block Defendant from leaving the parking lot. According to Officer Plummer, at the time he initiated his conversation with Defendant, there were no other officers present.

¶ 50        At the hearing, defense counsel played video recorded by Officer Plummer's dashboard camera during Officer Plummer's encounter with Defendant. This video begins when Defendant's and Officer Plummer's vehicles are already stopped and after Officer Plummer had asked Defendant if he had seen the earlier accident. The first verbal exchange the video depicts is Officer Plummer asking Defendant "how much have you had to drink?" Defendant replied he had consumed "a couple beers." After Officer Plummer clarified what Defendant meant by "a couple beers," he told Defendant to "hold tight for me real quick" and immediately pulled his patrol vehicle behind Defendant's. Officer Plummer got out of his patrol vehicle and approached Defendant's driver's door. Officer Plummer asked Defendant to get out of the Camaro and walk back between the Camaro and Officer Plummer's patrol vehicle. Officer Plummer asked if Defendant would submit to a breathalyzer test. Defendant refused. Officer Plummer commenced a field sobriety test by asking Defendant to perform certain tasks, including following Officer Plummer's hand with Defendant's eyes.

¶ 51        Eventually, another officer arrived on scene to assist Officer Plummer. Defendant was placed in custody and taken to the rear seat of Officer Plummer's patrol vehicle. Defendant asked: "What did I get pulled over for?" Officer Plummer replied: "So first of all, I saw you driving without your headlights on." Officer Plummer also told Defendant that Officer Plummer noticed Defendant had slurred speech and dilated eyes when Officer Plummer spoke with Defendant about the earlier crash. Later in the video, another officer tells Officer Plummer that the Camaro's headlights came on as soon as the other officer turned the car on in order to move it into a parking space. Officer Plummer replied that he had seen the Camaro moving without its rear lights operating.

¶ 52        Following arguments on the Motion to Suppress, the trial court made several oral Findings and denied Defendant's Motion. Defense counsel then announced Defendant's intent—previously communicated to the State—to enter a guilty plea following the denial of his Motion to Suppress and subsequently notice his appeal. Defendant subsequently entered a guilty plea to Driving While Impaired, as memorialized in a Transcript of Plea, which indicated his plea was entered after the Motion to Suppress was denied and reserving Defendant's right to appeal the trial court's denial of his Motion to Suppress. The trial court again imposed a suspended sixty-day sentence and placed Defendant on unsupervised probation for twelve months.

¶ 53        Defendant gave oral Notice of Appeal in open court and subsequently filed written Notice of Appeal from the trial court's denial of Defendant's Motion to Suppress and resulting 25 October 2019 Judgment to this Court on 4 November 2019. On 10 January 2020, the trial court filed a written Order denying Defendant's Motion to Suppress that included the following, pertinent Findings of Fact:

> 4. That Officer Plummer saw the Defendant's vehicle and observed that the Defendant's vehicle appeared to have its daytime running lights on for the headlights, but the rear lights were not illuminated.
>
> 5. That the lack of illuminated rear lights on the Defendant's vehicle drew Officer Plummer's attention to the vehicle.
>
>     . . . .
>
> 13. That after Officer Plummer followed the Defendant's vehicle into the parling lot, the Defendant's vehicle made a U-turn and began traveling towards Officer Plummer's vehicle.
>
> 14. That Officer Plummer drove driver's door to driver's door with the Defendant's vehicle, with Officer Plummer's vehicle facing the opposite direction as the Defendant's vehicle.
>
> 15. That as Officer Plummer pulled alongside the Defendant's vehicle, Officer Plummer extended his hand out of his driver's window, rested his forearm on his driver's door, and waved his hand up and down.
>
> 16. That Officer Plummer testified that his intention was to engage in a voluntary consensual conversation with the Defendant.
>
>     . . . .

18. That Officer Plummer began speaking with the Defendant to see if the Defendant had been through the area and witnessed the vehicle crash on Charles Blvd.

19. That Officer Plummer was approximately three to four feet away from the Defendant as they spoke.

20. That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, no other officers or patrol vehicles were on scene.

21. That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not engaged his blue lights or siren.

22. That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not positioned his patrol vehicle in a manner that would obstruct the Defendant's vehicle from exiting the parking lot nor restrict his movement in any way.

23. That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not directed the Defendant to get out of the Defendant's vehicle nor restricted the Defendant's freedom of movement in any way.

24. That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not indicated to the Defendant that the Defendant was in custody or that the Defendant was not free to leave.

25. That at the time Defendant stopped his vehicle and engaged in a conversation with Officer Plummer, Officer Plummer had not exited his patrol vehicle, taken any enforcement action, given any orders or commands to the Defendant, nor displayed any weapon or demonstrated any other show of authority to indicate that this was a traffic stop.

26. That during the conversation with the Defendant, Officer Plummer observed factors that ultimately led Officer Plummer to investigate and arrest the Defendant for Driving While Impaired.

Based on these Findings, the trial court concluded:

4. That pursuant to State v. Wilson, this Court has considered the factors that Officer Plummer was alone when he encountered the Defendant, that Officer Plummer did not draw his weapon, that Officer Plummer did not activate his lights or siren on his patrol car, that Officer Plummer did not do or say anything to indicate to the Defendant that the Defendant was required to stop, and that the Defendant was in the Defendant's own vehicle and could have driven around Officer Plummer's patrol car.

5. That Officer Plummer had not initiated a traffic stop at the time of his conversation with the Defendant.

6. That Officer Plummer's conversation with the defendant was a voluntary, consensual conversation between Officer Plummer and the Defendant at a time when the Defendant's freedom of movement was not restricted, and Officer Plummer had made no show of authority to indicate that the interaction was a traffic stop or that the Defendant was under arrest.

7. That the Defendant was not seized under the Fourth Amendment when he voluntarily stopped his own vehicle in the parking lot next to Officer Plummer's patrol vehicle and began conversing with Officer Plummer.

## II. Appellate Jurisdiction

"An order . . . denying a motion to suppress evidence may be reviewed upon an appeal from . . . a judgment entered upon a plea of guilty." N.C. Gen. Stat. § 15A-979(b) (2019). However, a defendant must (1) notify the prosecutor and the trial court of his intention to appeal during plea negotiations and (2) provide notice of appeal

from the final judgment. *State v. McBride*, 120 N.C. App. 623, 625-26, 463 S.E.2d 403, 404-05 (1995), *aff'd per curiam*, 344 N.C. 623, 476 S.E.2d 106 (1996).

¶ 56        Here, the Record, including discussion with the trial court and the Transcript of Plea memorializing Defendant's guilty plea arrangement, reflects Defendant gave timely notice to both the State and the trial court of his intention to appeal prior to the plea being finalized. *See id.*, 463 S.E.2d at 405 (citations and quotation marks omitted). Moreover, Defendant's timely filed written Notice of Appeal also satisfies our jurisdictional requirement by memorializing his Notice of Appeal of the *Judgment* in this action. *Cf. State v. Miller*, 205 N.C. App. 724, 725-26, 696 S.E.2d 542, 542-43 (2010) (dismissing a defendant's appeal for lack of jurisdiction where defendant gave notice of appeal from the denial of his motion to suppress but not from his *judgment* of conviction). Therefore, Defendant's appeal is properly before this Court.

### III. Analysis

¶ 57        "Upon timely motion, evidence must be suppressed if: (1) Its exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina[.]" N.C. Gen. Stat. § 15A-974(a) (2019). The Fourth Amendment to the United States Constitution protects an individual's right to be free from unreasonable seizures. U.S. Const. amend. IV. "Article I, Section 20 of the Constitution of North Carolina likewise prohibits unreasonable searches and seizures . . . ." *State v. Allman*, 369 N.C. 292, 293, 794 S.E.2d 301, 303 (2016). Therefore,

evidence obtained as the result of an unreasonable seizure must be suppressed upon timely motion.

¶ 58        "An appellate court accords great deference to the trial court's ruling on a motion to suppress because the trial court is entrusted with the duty to hear testimony (thereby observing the demeanor of the witnesses) and to weigh and resolve any conflicts in the evidence." *State v. Johnston*, 115 N.C. App. 711, 713, 446 S.E.2d 135, 137 (1994) (citations omitted). "Our review of a trial court's denial of a motion to suppress is strictly limited to a determination of whether [the trial court's] findings are supported by competent evidence, and in turn, whether the findings support the trial court's ultimate conclusion." *State v. Reynolds*, 161 N.C. App. 144, 146-47, 587 S.E.2d 456, 458 (2003) (citations and quotation marks omitted). The trial court's conclusions of law, however, are reviewed de novo. *See State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997). "In reviewing the denial of a motion to suppress, we examine the evidence introduced at trial in the light most favorable to the State[.]" *State v. Moore*, 152 N.C. App. 156, 159, 566 S.E.2d 713, 715 (2002) (citations omitted).

## A. The Trial Court's Findings

¶ 59        At the heart of Defendant's arguments both before the trial court and on appeal is his contention his encounter with Officer Plummer was not a voluntary conversation about a purported traffic accident, but rather an investigatory stop—

and, thus, a seizure—based on a pretext that Defendant was driving the Camaro without lights on. Defendant contends the evidence affirmatively establishes he was stopped on a pretext based on Officer Plummer's allegedly inconsistent statements as to whether and which lights were on and the dashcam footage taken after Defendant was detained by Officer Plummer showing: (a) the Camaro's lights were on when another officer moved the car, (b) that officer remarking that the lights came on automatically, and (c) Officer Plummer responding to Defendant's inquiry as to why he was stopped by noting "so, first of all, I saw you driving without your headlights on."

¶ 60    Thus, Defendant first challenges the trial court's Findings 4 and 5:

> 4. That Officer Plummer saw the Defendant's vehicle and observed that the Defendant's vehicle appeared to have its daytime running lights on for the headlights, but the rear lights were not illuminated.
>
> 5. That the lack of illuminated rear lights on the Defendant's vehicle drew Officer Plummer's attention to the vehicle.

¶ 61    Defendant argues Officer Plummer's statements during the encounter with Defendant, in his subsequent report, and testimony before the trial court are "materially inconsistent" and directly contradicted by the dashcam footage along with Defendant's supporting affidavit indicating the rented Camaro was equipped with automatic lights which were operable at the time Defendant rented the Camaro. The video evidence of the encounter, however, begins *after* Officer Plummer and

Defendant had stopped and had already begun conversing with one another, and, thus, does not capture Officer Plummer first observing the Camaro. As such, while the video evidence may well have some tendency to contradict Officer Plummer's testimony, at most it creates inconsistency in the evidence. This contradictory evidence and the evidence of the Camaro's automatic light feature and Officer Plummer's allegedly inconsistent statements may well, in turn, tend to bear on the credibility and weight to be given to Officer Plummer's testimony he first observed the Camaro being driven at night with no lights on. Nevertheless, it is the role of the trial court—and not this Court—to weigh testimony and resolve inconsistencies in the evidence. *State v. Steen*, 352 N.C. 227, 237, 536 S.E.2d 1, 7 (2000) ("[A] trial court's resolution of a conflict in the evidence will not be disturbed on appeal[.]"); *Johnston*, 115 N.C. App. at 713, 446 S.E.2d at 137 ("the trial court is entrusted with the duty to hear testimony (thereby observing the demeanor of the witnesses) and to weigh and resolve any conflicts in the evidence").

¶ 62        Here, the trial court weighed the evidence and resolved the conflict in the evidence in favor of the State. Thus, there is evidence—in the form of Officer Plummer's testimony—to support the trial court's Findings 4 and 5. Moreover, ultimately, these Findings were not dispositive to the trial court's conclusion Officer Plummer did not initially seize Defendant when Defendant stopped to talk with

Officer Plummer in the parking lot because the trial court's ruling did not turn on whether Officer Plummer had reasonable suspicion to conduct an investigatory stop.

### B. Voluntary Encounter

¶ 63        Rather, the trial court concluded the encounter between Defendant and Officer Plummer was voluntary. Therefore, the inquiry turns to whether the trial court's Findings support this conclusion. Specifically, Defendant argues Officer Plummer seized Defendant, for Fourth Amendment purposes, because Officer Plummer waved at Defendant to stop, constituting a show of authority to which Defendant acquiesced. Defendant further contends because Officer Plummer did not have probable cause or reasonable suspicion to seize Defendant initially, the stop violated his rights under the Fourth Amendment, and the trial court should have suppressed the evidence obtained as a result of an unreasonable seizure.

¶ 64        Here, relevant to the issue of whether the initial encounter was a stop for Fourth Amendment purposes, the trial court found: Officer Plummer "pulled alongside" Defendant's vehicle, rested his arm on his driver's window frame, and waved his hand up and down; Officer Plummer was "three to four" feet away from Defendant as they were speaking; Officer Plummer began speaking with Defendant to see if Defendant had witnessed the earlier crash; no other officers were initially at the scene; that when Defendant stopped and spoke with Officer Plummer, Officer Plummer had not engaged his blue lights or siren; Officer Plummer had not

obstructed Defendant's vehicle from leaving the parking lot; at the time Defendant stopped his vehicle, Officer Plummer did not direct Defendant to get out of Defendant's vehicle nor restricted Defendant's freedom of movement in any way; and at the time Defendant stopped, Officer Plummer had not given Defendant any orders or commands, indicate that Defendant was in custody or not free to leave, nor did Officer Plummer display a weapon or demonstrate "any other show of authority[.]"

¶ 65    Defendant first challenges Finding 16 where the trial court found: "That Officer Plummer testified that his intention was to engage in a voluntary consensual conversation with the Defendant." Defendant argues this Finding is invalid to support the trial court's conclusion because it constitutes a mere recitation of Officer Plummer's testimony rather than a true Finding of Fact. Although Defendant is correct in this assertion, this purported "Finding" does not impact the analysis of the trial court's conclusion because "the Fourth Amendment does not include a consideration of the officer's subjective intent, and his motive will not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *State v. Icard*, 363 N.C. 303, 318, 677 S.E.2d 822, 832 (2009) (Newby, J. dissenting) (quoting *Whren v. United States*, 517 U.S. 806, 812-13, 135 L. Ed. 2d 89, 98 (1996) (citation and quotation marks omitted)).

¶ 66    Defendant further challenges the portions of the trial court's Findings 24 and 25 establishing Officer Plummer had not indicated Defendant was in custody or not

free to leave, had not taken any enforcement action, had not given Defendant any orders or commands, nor demonstrated any other show of authority to Defendant. Whether, however, Officer Plummer's actions in waving at Defendant to stop his vehicle constituted a show of authority is a question of law. *Icard*, 363 N.C. at 308, 677 S.E.2d at 826. Thus, this determination is reviewed de novo. *Id.* Therefore, as conclusions of law, these findings are more properly reviewed in tandem with our review of the trial court's labelled Conclusions of Law:

> 4. That pursuant to State v. Wilson, this Court has considered the factors that Officer Plummer was alone when he encountered the Defendant, that Officer Plummer did not draw his weapon, that Officer Plummer did not activate his lights or siren on his patrol car, that Officer Plummer did not do or say anything to indicate to the Defendant that the Defendant was required to stop, and that the Defendant was in the Defendant's own vehicle and could have driven around Officer Plummer's patrol car.
>
> 5. That Officer Plummer had not initiated a traffic stop at the time of his conversation with the Defendant.
>
> 6. That Officer Plummer's conversation with the defendant was a voluntary, consensual conversation between Officer Plummer and the Defendant at a time when the Defendant's freedom of movement was not restricted, and Officer Plummer had made no show of authority to indicate that the interaction was a traffic stop or that the Defendant was under arrest.
>
> 7. That the Defendant was not seized under the Fourth Amendment when he voluntarily stopped his own vehicle in the parking lot next to Officer Plummer's patrol vehicle and began conversing with Officer Plummer.

¶ 67        "A seizure occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *State v. Turnage*, 259 N.C. App. 719, 723, 817 S.E.2d 1, 4 (2018) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16 (1968)); *see also State v. West*, 119 N.C. App. 562, 566, 459 S.E.2d 55, 58 (1995) ("A seizure does not occur until there is a physical application of force or submission to a show of authority.") (citing *California v. Hodari D.*, 499 U.S. 621, 626, 113 L. Ed. 2d 690, 697 (1991)). However, "[n]o one is protected by the Constitution against the mere approach of police officers in a public place . . . communication between the police and citizens involving no coercion or detention" does not implicate the Fourth Amendment. *State v. Brooks*, 337 N.C. 132, 141, 446 S.E.2d 579, 585 (1994) (citations and quotation marks omitted). Rather, "[t]he test for determining whether a seizure has occurred is whether under the totality of the circumstances a reasonable person would feel that he was not free to decline the officers' request or otherwise terminate the encounter." *Id.* at 142, 446 S.E.2d at 586 (citing *Florida v. Bostick*, 501 U.S. 429, 434-38, 115 L. Ed. 2d 389, 398-99 (1991)).

¶ 68        When reviewing the totality of the circumstances surrounding an alleged show of authority, our courts review factors including but not limited to: "the number of officers present, whether the officer displayed a weapon, the officer's words and tone of voice, any physical contact between the officer and the individual, whether the officer retained the individual's identification or property, the location of the

encounter, and whether the officer blocked the individual's path." *Icard*, 363 N.C. at 303, 309, 677 S.E.2d at 827 (citing *United States v. Drayton*, 536 U.S. 194, 153 L. Ed. 2d 242 (2002)). Moreover: "The activation of blue lights on a police vehicle" is a factor to consider but is not alone determinative. *State v. Baker*, 208 N.C. App. 376, 386, 702 S.E.2d 825, 832 (2010).

¶ 69 In *State v. Brooks*, the North Carolina Supreme Court concluded an officer did not need reasonable suspicion or probable cause to walk up to a man sitting in a vehicle and to ask the man—once the officer saw an empty gun holster next to the man—where the gun was. 337 N.C. at 142, 446 S.E.2d at 586. There, the Court reasoned the encounter with the uniformed officer was not a seizure because the officer did not apply force and the defendant did not submit to a show of force. *Id.* The officer simply asked a question, and when the defendant answered stating he was sitting on the gun, the officer then had probable cause to arrest the defendant and search the defendant's vehicle. *Id.*

¶ 70 This Court has also weighed in on whether the totality of the circumstances surrounding individuals' encounters with police constitute a seizure for Fourth Amendment purposes. We have held encounters not involving police applying physical force to be seizures requiring at least reasonable suspicion. In *State v. Knudsen*, police observed the defendant walking toward a car with a "clear cup" and in an area surrounded by restaurants that served alcohol. 229 N.C. App. 271, 275-

76, 747 S.E.2d 641, 645-46 (2013). Officers, both in uniform with weapons, watched the defendant get into the car briefly, then get out and walk down a nearby sidewalk. *Id.* at 282, 276 S.E.2d at 649. One officer stopped his bicycle on the sidewalk in front of the defendant and the other parked his police vehicle behind the defendant in an alley cutting off the sidewalk behind the defendant. *Id.* at 283, 276 S.E.2d at 650. The officer on the bicycle asked the defendant what was in the cup. *Id.* We held the officers had seized the defendant when they blocked his path, and one officer asked the defendant what was in his cup. *Id.* We reasoned, after considering the totality of the circumstances, a reasonable person would not feel he or she was free to leave. *Id.*

¶ 71        However, we have held encounters where police do not use force or overt shows of authority were not seizures requiring at least reasonable suspicion. Our prior decisions in *State v. Williams*, 201 N.C. App. 566, 686 S.E.2d 905 (2009), and *State v. Wilson*, 250 N.C. App. 781, 793 S.E.2d 737 (2016), *aff'd per curiam*, 370 N.C. 389 (2017), are highly instructive.

¶ 72        In *Williams*, a police officer followed a car at approximately 1:30 a.m. because, as the officer testified, the car's license plate was dirty and obscured. 201 N.C. App. at 567, 686 S.E.2d at 906. As the officer followed the car and ran the license plate in the officer's computer, the car pulled into a driveway. *Id.* The officer then pulled his vehicle to the curb on the other side of the street from the driveway. *Id.* The officer

approached the vehicle and recognized a passenger in the vehicle as someone he had seen in prior drug possession and prostitution arrests. *Id.* The officer asked the driver about the car's thirty-day tag; the driver responded that the tag was expired. *Id.* We held this was not a seizure and relied on our prior decision in *State v. Isenhour*, 194 N.C. App. 539, 670 S.E.2d 264 (2008). *Williams*, 201 N.C. App. at 571, 686 S.E.2d at 908-09 ("[O]ur Court noted: (1) that the defendant was free to drive away from the officers, as the patrol car did not physically block the defendant's car; (2) that nothing else in [the officer's] behavior or demeanor amounted to the show of force necessary for a seizure to occur[;] (3) that the officers did not create any real psychological barriers to [the] defendant's leaving such as activating their siren or blue lights, removing guns from their holsters, or using threatening language; and (4) that the encounter proceeded in a non-threatening manner and that [the] defendant was cooperative at all times.") (citations and quotation marks omitted).

¶ 73        Thus, as in *Isenhour*, we held the encounter in *Williams* was not a seizure because:

> [The officer] parked his patrol car on the opposite side of the street from the driveway in which Defendant was parked, and thus did not physically block Defendant's vehicle from leaving the scene. Further, Officer Wade did not activate the siren or blue lights on his patrol car. There is no evidence that he removed his gun from its holster, or used any language or displayed a demeanor suggesting that Defendant was not free to leave. As was the case in *Isenhour*, it appears that the encounter between Officer Wade and Defendant proceeded in a non-threatening manner and that

> [D]efendant was cooperative at all times. A reasonable person in
> these circumstances would feel free to disregard the police and go
> about his business.

201 N.C. App. at 571, 686 S.E.2d at 909 (citations and quotation marks
omitted).

¶ 74　　More recently, in *Wilson*, we held a similar encounter to the one in this case
was not a seizure. An officer approached a house to inquire about a person wanted
for arrest. *Wilson*, 250 N.C. App. at 782, 793 S.E.2d at 738. The officer parked his
vehicle across the street from the house. *Id.* As the officer approached the house, he
saw a vehicle backing out of the driveway. *Id.* The officer was behind the vehicle and
waved his hands above his shoulders in order to get the vehicle to stop. *Id.* As soon
as the officer approached the driver, he could smell alcohol and asked the driver how
many drinks the driver had consumed. *Id.* In concluding this was not a seizure, we
reasoned:

> Considering the totality of the circumstances, Officer Johnson's
> hand motions were not so authoritative or coercive that a
> reasonable person would not have felt free to leave. This holding
> is in line with established North Carolina precedent in cases in
> which no lights or sirens were used, no weapon was brandished,
> no language or behavior was used indicating compliance was
> mandatory, and the defendant's movement was not blocked.

*Id.* at 788, 793 S.E.2d at 742.

¶ 75　　Here, as in *Williams*, Officer Plummer's encounter with Defendant was in the
early morning hours. Officer Plummer was in uniform and driving a marked patrol

vehicle but never activated his blue lights or siren, nor did he give any verbal commands to Defendant to stop. Although he did not merely approach Defendant on foot and ask Defendant a question, Officer Plummer waving his hand to get Defendant to stop is similar to the officer waving his arms in *Wilson*. Moreover: there were no other officers at the scene; Officer Plummer did not display his firearm; Officer Plummer did not block Defendant from leaving the parking lot; and Officer Plummer did not shout or use a tone of voice indicating authority—he simply asked Defendant if Defendant had seen anything regarding the earlier, single-car crash. Our existing precedent compels the conclusion this conversation would not lead a reasonable person to feel he or she was not free to leave.

¶ 76        Thus, in this case, the trial court properly considered the totality of the circumstances, including specifically applying the factors employed in *Wilson*, to conclude Officer Plummer's encounter with Defendant was voluntary. Therefore, the trial court further properly concluded Officer Plummer's initial encounter was not a seizure for Fourth Amendment purposes. Defendant was not seized until Officer Plummer, already having at least reasonable suspicion Defendant was impaired, asked how many drinks Defendant had consumed and told Defendant to remain where he was as Officer Plummer maneuvered his vehicle behind Defendant's vehicle. Consequently, the trial court did not err by denying Defendant's Motion to Suppress.

¶ 77        The majority points to three "key differences" between this case and the above precedent: (1) that the encounter involved two moving vehicles; (2) the time and location of the encounter; and (3) "Officer Plummer's use of authoritative gestures to hail down Defendant's vehicle." Moreover, the majority accuses the trial court, and this dissent, of *ignoring* the fact that this case involved two moving vehicles. Not so. The trial court's Order, and this dissent, simply apply our existing precedent to the circumstances involving an officer in a vehicle gesturing to a defendant in another vehicle as presented in this case. As noted above, this precedent contemplates factors equally applicable to a determination of a show of authority, including when both the police and a defendant are in moving vehicles—for example, whether the officer has engaged the vehicle's blue lights or sirens. *Baker*, 208 N.C. App. at 386, 702 S.E.2d at 832.

¶ 78        This case, as noted above, is also similar in time and location to the time and location in *Williams*. Here, the encounter between Officer Plummer and Defendant began just before 3 a.m. In *Williams*, the encounter between the officer and the defendant occurred at approximately 1:30 a.m. Thus, both cases involved encounters with police in the early morning hours where, presumably, the officers and the defendants were not surrounded by other people and vehicle traffic. In *Williams*, the officer approached the vehicle in a *private* driveway, which may well be more coercive than here where Officer Plummer approached a vehicle in a parking lot. The majority

points to Officer Plummer's "tailing" Defendant during the morning hours as particularly coercive. However, the officer in *Williams* also "tailed" the defendant. 201 N.C. App. at 567, 686 S.E.2d at 906. Moreover, the Record does not indicate Defendant in this case ever recognized Officer Plummer was following him.

¶ 79 Last, the majority asserts the trial court "overlooked" Officer Plummer's "authoritative physical gestures." However, the trial court expressly considered the facts and factors in *Wilson* in concluding Officer Plummer did not seize Defendant. In *Wilson*, the officer waved his arms above his shoulders in order to get the defendant to stop the defendant's moving vehicle. *Wilson*, 250 N.C. App. at 782, 793 S.E.2d at 738. In this case, Officer Plummer rested his arm on his driver's window frame and moved his hand up and down to get Defendant's attention. Thus, if there is a distinction between the facts of this case and *Wilson*, it is that the physical gestures in *Wilson*—where we held there was no seizure—were arguably *more* authoritative than the gestures in this case.

¶ 80 The majority also asserts our application of existing precedent encourages the public to ignore, what the majority concedes are, police "requests" at the public's own legal peril. Again, not so. Cooperation between law enforcement and the public they serve in myriad of daily consensual, voluntary interactions is essential to a functioning civil society—and, to be clear, that cooperation and civility must extend *both* ways to avoid unnecessary escalation of these encounters. Our law recognizes,

however, that there can be a fine line between a voluntary encounter with law enforcement and a Fourth Amendment seizure and further recognizes that the proper place for that line drawing exercise is in the courts and not on the streets—and, further still, that a trial court weighing all the circumstances and hearing and seeing the evidence first-hand is in the best place to make these crucial factual determinations.

## IV. Conclusion

Here, the trial court properly conducted the analysis of the circumstances by finding facts supported by the evidence and which support its legal conclusions. The trial court's Order and subsequent Judgment entered upon Defendant's plea should be affirmed.